# WIBORG v. UNITED STATES.

ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR THE
EASTERN DISTRICT OF PENNSYLVANIA.

No. 966. Submitted May 18, 1896.—Decided May 25, 1896.

The several acts described in and made punishable by Rev. Stat. § 5286, are
stated therein separately and disjunctively, connected by the conjunction
"or." The indictment in this case, charging that the defendants com-
mitted some of those acts, connects them by the conjunction "and." No
question of duplicity was raised by the defendants' counsel. The trial
judge instructed the jury that the evidence would not justify a convic-
tion of anything more than providing the means for, or aiding the mili-
tary expeditions set forth in the indictment, by furnishing transportation
for their men, etc. Held, that the verdict could not be disturbed on the
ground that more than one offence was included in the same count of the
indictment.

Providing, or preparing the means of transportation for such a military
expedition or enterprise as is referred to in Rev. Stat. § 5286, is one of
the forms of provision or preparation therein denounced.

A hostile expedition, dispatched from a port of the United States, is within
the words "carried on from thence."

A body of men went on board a tug in a port of the United States, loaded
with arms; were taken by it thirty or forty miles and out to sea; met a
steamer outside the three mile limit by prior arrangement; boarded her
with the arms, opened the boxes and distributed the arms among them-
selves; drilled to some extent; were apparently officered; and then, as
preconcerted, disembarked to effect an armed landing on the coast of
Cuba, when the United States were at peace with Spain. Held, that this
constituted a military expedition or enterprise within the provisions of
the Revised Statutes.

On the question whether the defendants aided the expedition with knowl-
edge of the facts, the jury were instructed that they must acquit unless
they were satisfied beyond reasonable doubt that defendants, when they
left Philadelphia, had knowledge of the expedition and its objects, and
had arranged and provided for its transportation. Held, that the defend-
ants had no adequate ground of complaint on this branch of the case.

A statement of facts by the court in a recapitulation of the evidence, based
on uncontradicted testimony, no rule of law being incorrectly stated,
and the facts being submitted to the determination of the jury, is not
open to exception.

The ruling in Simmons v. United States, 142 U. S. 148, that "the judge pre-
siding at a trial, civil or criminal, in any court of the United States, may
express his opinion to the jury upon the questions of fact which he sub-

mits to their determination" applied to statements by the court below in its charge in this case.

Assuming that a secret combination between the party and the captain or officers of the Horsa had been proven, then, on the question whether such combination was lawful or not, the declarations of those engaged in it explanatory of acts done in furtherance of its object were competent.

Where a plain error has been committed in a matter vital to defendants, this court is at liberty to correct it, although the question may not be properly raised; and being of opinion that adequate proof of guilty knowledge or participation on the part of the mates is not shown by the record, it reverses the judgment as to them, although no exception was taken.

WIBORG, the captain, and Petersen and Johansen, the mates, of the steamer Horsa, were indicted in the District Court of the United States for the Eastern District of Pennsylvania under section 5286 of the Revised Statutes. The indictment charged that defendants, "mariners, at the district aforesaid and within the jurisdiction of this court, did, within the territory and jurisdiction of the United States, to wit, at the port of Philadelphia, Pennsylvania, within the district aforesaid, begin, set on foot and provide and prepare the means for a certain military expedition and enterprise to be carried on from thence against the territory and dominions of a foreign prince, to wit, against the Island of Cuba, the said Island of Cuba being then and there the territory and dominions of the King of Spain, the said United States being then and there at peace with the King of Spain, contrary to the form of the act of Congress in such case made and provided and against the peace and dignity of the United States of America." They were tried before Judge Butler and a jury, and convicted. Motions in arrest of judgment and for a new trial were severally made and overruled, and defendants were sentenced to pay fines and to serve terms in the state penitentiary. This writ of error was thereupon sued out and defendants admitted to bail.

The Horsa was a Danish steamer, sailing under the Danish flag, and defendant Wiborg, its captain, was a subject of the King of Denmark, as were also his co-defendants, as claimed by their counsel.

The Horsa was engaged in the fruit business for John D. Hart & Company, of Philadelphia, and on November 9, 1895, cleared from Philadelphia for Port Antonio, Jamaica. She had on board but little cargo, consisting of two life-boats, a lot of empty boxes and barrels, two horses, some horse feed, bales of hay and boxes of corn, all of which were entered on her manifest. Just before sailing, Captain Wiborg received a message, (in writing but not produced,) which, he said, was: "After I passed the Breakwater to proceed north near Barnegat and await further orders." The Horsa sailed between six and seven P.M., and, after passing the Delaware Breakwater, her proper course would be southward. She turned, however, to the northward, went up the Jersey coast to Barnegat light and anchored on the high seas between three and four miles off the shore. Between ten and eleven the same evening the steam lighter J. S. T. Stranahan sailed from Brooklyn, carrying some cases of goods and two life-boats, which had been put on board by the crew of the lighter during the evening. On the lower bay of New York, below Staten Island, during the night she took on board between thirty and forty passengers, mostly dark-complexioned men speaking a foreign language, apparently Cubans or Spaniards. The lighter then ran down to Barnegat, where she saw the Horsa under a white flag. She also ran up a white flag, went alongside, and put aboard her passengers with the cases of goods and the life-boats. They brought authority in writing from John D. Hart & Company, which was not produced. Captain Wiborg saw the transfer made, and assented to it. His firemen complaining, he answered: "I told them if anybody had to hang for this I would be the man to hang for it." He testified that the man on the lighter brought him a message from John D. Hart & Company. "He told me to take those men and luggage and whatever they had aboard the Horsa, and let them off whenever they called for it to be let off. I shipped two boats at the same time, and the order of my message was to deliver those two boats to those men and the two boats that I had shipped here in Philadelphia. . . . The only order was they had a colored man there that they

called the pilot, and whenever he called for them to be let off I should let them off and give them the boats." As to the boats taken on at Philadelphia and those taken on off Barnegat, he was "to deliver them to these men as soon as they called for them. . . . The pilot did not tell me where he was going. I did talk to him, but he could talk very little English." The captain testified that the writing from J. D. Hart & Company, "to take whatever was in the tug, the men and their luggage and boxes, and let them off whenever they called for it to be let off," did not strike him as an unusual thing; it did not strike him as unusual "that these men were to be taken on board and turned out on the sea with the boats." It appeared and was admitted that there was an insurrection in Cuba. The captain was informed that the party was going to Cuba, and believed the men were going to fight for Cuba, but was careful to ask no questions, and testified that he considered his own part in the affair to be lawful. The charter-party was not produced.

After boarding the Horsa, these persons broke open the boxes which they had brought with them, and took out rifles, swords and machetes, and one cannon. They also had cartridge belts, medicines, and bandages with them. They were not in uniform, but there was evidence that some of them had caps with a little flag, which they said was a Cuban flag. They brought their own food with them. The evidence tended to show that when these men divided up the arms, every man had a rifle; that certain of them, understood to be officers, had swords and revolvers; that one seemed to be in command of them; and that this commander asked some of the crew whether they would fight if attacked by a Spanish gunboat. There was also some evidence that there were military exercises in the nature of drilling by from three to seven men at a time; that these persons stated that they were going to Cuba to fight the Spaniards; that on the second day out they made small canvas bags to put cartridges in, and unpacked a bale of blankets which they had brought with them, wrapped one hundred and fifty spare rifles in these blankets in small bundles, about five in each, and threw the

boxes overboard in which the rifles had come, taking a rifle, sword and machete apiece, and practising with them and the cannon. There were three kinds of cartridges and two kinds of rifles. One witness stated that, as he was informed by them, there were small Winchesters for the cavalry and big rifles for the infantry; big revolvers for the officers; and that the cannon was a Maxim gun, in charge of a French Canadian. This machine gun was worked with a slot and a crank, and had its own cartridges. The witness saw it worked, and saw them practising with it, and the man in charge showed him how they were doing it. Some testimony was introduced on behalf of defendants to the effect that a machete is generally carried by the inhabitants of the West Indies, and has many peaceful uses. One of the defendants' witnesses admitted that it was a formidable weapon, and, moreover, that he had never seen citizens carry guns in Cuba. It is unquestioned that the machete is used for both war and peace, it being described in the Century Dictionary as a "heavy knife or cutlass, used among Spanish colonists and Spanish American countries, both as a tool and as a weapon," and by Webster as "a large, heavy knife, resembling a broadsword, often two or three feet in length, used by the inhabitants of Spanish America as a hatchet to cut their way through thickets, and for various other purposes."

After leaving Barnegat, the Horsa took the usual course for Jamaica, which follows the Cuban coast for about six hours. The usual color of her funnel was yellow below with red above and black on top, and it was so painted when she left Philadelphia. While she was at sea the funnel was repainted red and black, and when she returned to Philadelphia it was black, red and yellow. The name of the Horsa was painted out amidships, but her name was on the stern in brass letters and on the bow, and those letters were not painted over to the captain's knowledge. About six miles off the coast of Cuba the colored pilot gave orders to disembark. This was about eleven o'clock at night, and the disembarkation was conducted under the supervision of Captain Wiborg, who had the lights of the vessel put out. The two boats

were launched which had come on board at Philadelphia and also those which had come with the lighter, and Captain Wiborg sold the men one of the ship's boats. As one of the boats leaked, another was lowered from the ship. The passengers took to the boats, taking with them all the ammunition and arms they could carry. The steamer then undertook to tow the boats, but a strange light was seen in the distance, and at the request of the men the captain cut the boats loose and started away at full speed. Some forty boxes of cartridges had been left on the Horsa because there was no room for them on the boats, and Captain Wiborg directed that these should be thrown overboard. He said this was to avoid getting into trouble at Port Antonio, since the boxes were not manifested for that port. The Horsa then completed her voyage to Port Antonio. The captain said he told the collector there he had lost two boats, "to put him off his guard."

Defendants' counsel requested the court to give to the jury thirteen points of instructions, of which the fourth, fifth, sixth, seventh, eighth, ninth and eleventh were as follows :

"4. That the laws of the United States and the section under which the defendants are indicted do not prohibit transporting of arms or of military equipments to a foreign country or forbid one or more individuals, singly or in unarmed association, from leaving the United States for the purpose of joining in any military operations which are being carried on between other countries or between different parties in the same country.

"5. That before the jury can find the defendants guilty under this indictment they must first find that there was a 'military expedition or enterprise' against the territory of the King of Spain. A military expedition or enterprise does not exist unless there is a military organization of some kind designated as infantry, cavalry or artillery, and officered and equipped for active hostile operations.

"6. That if the jury find that there were transported on board of the Horsa arms and men, but the same were not a 'military organization as infantry, cavalry or artillery, and

officered and equipped, or in readiness to be officered and equipped,' then the jury must find the defendants not guilty.

"7. That it is not an offence against the laws of the United States for a shipper to ship arms to a foreign country or for volunteers to go to a foreign country for the purpose of joining in military operations which are being carried on between other countries or between different parties in the same country; in such cases the shipper and volunteer would run the risk, the one of capture of his property, and the other of the capture of his person by the foreign power; but the master of the ship transporting such arms and volunteers, not being a military expedition or enterprise, would not commit any offence against the laws of the United States and would not be liable under this indictment.

"8. That if the jury find from the evidence in this case that the officers of the steamship Horsa took on board, off the coast of New Jersey, on the high seas, a number of men, all dressed as citizens, without arms and equipments on their persons, and at the same time took on board certain boxes of arms and ammunition and munitions of war, but that the said men were not organized as infantry, cavalry or artillery or ready for such organization, the jury are instructed that they must find the defendants not guilty, even if the jury believe that the passengers on board intended to enlist, on arrival in Cuba, in the Cuban army.

"9. That if the jury find from the evidence that the defendants took on board their vessel, off the New Jersey coast, a number of men, unarmed and not organized, either as infantry, cavalry or artillery, and at the same time took on board boxes of ammunition and arms, the jury are instructed that they must find the defendants not guilty, even if the jury should believe that the men intended upon arrival in Cuba to enlist in the Cuban army, and that the boxes of arms were intended for use in the Cuban army."

"11. That if the jury find from the evidence that the passengers and boxes of arms did not constitute a military expedition or enterprise, but that the said passengers were simply going to Cuba to enlist in either army, and the said

arms and ammunition were being conveyed to Cuba to be used by either army, then the jury are instructed that the defendants in transporting them in due course of their business committed no offence against the laws of the United States; and the jury are further instructed that all evidence of secrecy, such as taking on the passengers and boxes of arms on the high seas and putting out the lights off the coast of Cuba, were acts which the defendants might lawfully do to avoid the capture of the passengers and the capture of the property from off their ship by Spanish men-of-war; but under such circumstances, if the jury find there was no military expedition or enterprise, such acts would not of themselves be evidence of any intent to violate the statute of the United States under which the defendants are indicted."

The court charged the jury, explaining the indictment, and then continued as follows:

"The evidence heard would not justify a conviction of anything more than providing the means for or aiding such military expedition by furnishing transportation for the men, their arms, baggage, etc. To convict them, you must be fully satisfied by the evidence that a military expedition was organized in this country, to be carried out as and with the object charged in the indictment, and that the defendants, with knowledge of this, provided means for its assistance and assisted it as before stated.

"Thus you observe the case presents two questions: First, was such military expedition organized here in the United States? Secondly, did the defendants render the assistance stated here with knowledge of the facts?

"In passing on the first question, it is necessary to understand what constitutes a military expedition, within the meaning of the statute. For the purposes of this case, it is sufficient to say that any combination of men organized here to go to Cuba to make war upon its government, provided with arms and ammunition, we being at peace with Cuba, constitutes a military expedition. It is not necessary that the men shall be drilled, put in uniforms, or prepared for efficient service, nor that they shall have been organized as, or accord-

ing to the tactics or rules which relate to, what is known as infantry, artillery or cavalry. It is sufficient that they shall have combined and organized here to go there and make war on the foreign government, and have provided themselves with the means of doing so. I say 'provided themselves with the means of doing so,' because the evidence here shows that the men were so provided. Whether such provision, as by arming, etc., is necessary, need not be decided in this case. I will say, however, to counsel that were that question required to be decided, I should hold that it is not necessary.

"Nor is it important that they intended to make war as an independent body or in connection with others. Where men. go without combination and organization to enlist as individuals in a foreign army, they do not constitute such military expedition, and the fact that the vessel carrying them might carry arms as merchandise would not be important."

Taking up defendants' thirteen points, the court disposed of them as follows:

"'1. It is not a crime or offence against the United States, under the neutrality laws of this country, for individuals to leave this country with intent to enlist in foreign military service, nor is it an offence against the United States to transport persons out of this country and to land them in foreign countries when such persons have an intention to enlist in foreign armies.'

"As a general proposition this is true, and the point is affirmed.

"'2. It is no offence against the laws of the United States to transport arms, ammunition and munitions of war from this country to any other foreign country, whether they are to be used in war or not; that in such case the shipper and transporter of the arms, ammunition and munitions of war only run the risk of the capture and seizure of such arms and contraband of war by the foreign power against whom they are intended to be used; but this does not make it an offence against the laws of the United States, and for such cause the defendants cannot be held guilty.'

"This is also true. No military expedition would exist in such case.

" ' 3. That it is no offence against the laws of the United States to transport persons intending to enlist in foreign armies, and arms and munitions of war, on the same ship; that in such case the persons transported and the shipper and transporter of the arms run the risk of seizure and capture by the foreign power against whom the arms were to be used and against whom the persons and passengers intended to enlist; but such cause did not constitute an offence against the laws of the United States, and for such cause the defendants cannot be found guilty.'

" This is true, provided the persons referred to herein had not combined and organized themselves in this country to go to Cuba and there make war on the government. If they had so combined and organized, and yet intended when they reached Cuba to join the insurgent army and thus enlist in its service, and the arms were taken along for their use, they would constitute a military expedition, as before described, and the transportation of such body of persons from this country for such a purpose would be an offence against the statute.

" The fourth, fifth, sixth, seventh, eighth and ninth points are fully answered by what has been said.

" ' 10. Even if the jury do find that the men taken on board were an organized military force with officers, as infantry, cavalry or artillery, the jury cannot find the defendants guilty unless the jury also find that the defendants knew that they were such a military organization as infantry, cavalry or artillery, constituting a military expedition or enterprise against the kingdom of Spain.'

" As before stated, to justify conviction of the defendants, the jury must be fully satisfied that the defendants knew that the men constituted a military expedition such as I have described.

" The eleventh point has been fully answered by what the court has said.

" The twelfth point is a very important point, and is as follows:

" ' 12. If the jury find that when the defendants left Phila-

delphia, and until after they had passed beyond the jurisdiction of the United States, they were ignorant of the fact that they were to transport the men in question, with their arms and provisions, and find that the point off Barnegat where the men in question were taken aboard was beyond the jurisdiction of the United States — in other words, beyond the three mile limit — and find that the vessel was sailing under a Danish flag, then and in that case they will find the defendants not guilty.'

"This point raises the question whether the defendants committed an offence against the statute, if the only aid which they furnished the expedition was furnished out at sea, beyond the jurisdiction of this country; and I instruct you that if the only aid furnished the vessel, being a foreign vessel, was so beyond our jurisdiction they did not commit an offence, and must consequently be acquitted. They allege that the point off Barnegat where the men were taken on board was not within three miles of our shore. If this is true, and the defendants did not start from our shore under an agreement to provide the means for transporting and to transport the men, but were ignorant of the object of going to Barnegat until they reached there, they cannot be convicted.

"If, however, they entered into an arrangement here to furnish and provide the means of transportation, and provided it, they are guilty, if this was a military expedition, although the men were not taken aboard and the transportation did not commence until the ship anchored off Barnegat.

"'13. It is the duty of the government to satisfy the jury beyond a reasonable doubt that the men and arms and ammunition taken on board the steamship Horsa was a military expedition or enterprise from the United States against the kingdom of Spain, and also that the defendants knew or shut their eyes to the fact that it was a military expedition or enterprise from the United States against the kingdom of Spain; and if the jury have from the testimony any reasonable doubt upon either of these questions or facts, the jury will find the defendants not guilty.'

"This point is affirmed. I trust the jury understand it. To convict the defendants it is necessary that the government shall have satisfied your minds beyond a reasonable doubt that this was a military enterprise, and that the defendants when they started knew it. Otherwise they are not guilty."

The court then further recapitulated and commented on the evidence, and, in the course of doing so, said:

"Some of them who were able to speak English declared that they were Cubans going to Cuba to fight the Spanish; and if these men were in combination to do an unlawful act, what was said by any of them at the time in carrying out their purpose was evidence against them all as to the nature of the expedition. . . .

"That this was a military expedition designed to make war against the government of Spain would seem to the court to be free from reasonable doubt. The question, however, is one for your determination alone, and I submit it to you as such, reminding you that the responsibility of deciding it rests upon you only. If you find that this was not a military expedition, or, rather, if you are not fully satisfied that it was, your verdict will be for the defendants, without going further. If, on the other hand, you find that it was a military expedition intended to make war against the government of Cuba, then you must pass upon the second question stated, to wit, Did the defendants, with knowledge of the facts, aid in carrying out its purpose in going to Cuba? They transported the men with their arms, ammunition and provisions. Did they enter upon this service here with the knowledge of the fact that the men constituted a military expedition, to fight against the government of Cuba? . . . From this and any other testimony bearing on this subject you must determine whether they understood what the expedition and its objects were, and had arranged and provided for its transportation when they left Philadelphia or left our shores within the three mile limit stated. If they were ignorant on this subject until they anchored off Barnegat light, the point being, according to the testimony, beyond the jurisdictional limits of the United States,

no offence was committed, as I have before stated, against the laws of this country.

"The question, therefore, is, Did the defendants understand they were to carry this expedition and had provided for it, and understand what the expedition was before leaving here? As you have seen, they took on two extra boats before starting, and cleared for Port Antonio, Jamaica, and turned off of their course at the Breakwater (the captain explaining this, to which explanation you will give whatever weight you deem it to be worth). When the men came to the ship off Barnegat, there is no evidence that the captain or any one of the defendants expressed or exhibited any surprise. It was then manifest that the service required was to carry men and arms to Cuba (the captain says he then so understood it), a most hazardous undertaking. Is it probable that the defendants would have risked themselves and their ship in this service if they had not been prepared for it by previous arrangement, and have done it without demurring or hesitating? Again, is it likely that those in charge of the expedition would have risked bringing the men and the property to that point on the mere chance that the defendant would take the risk of carrying them and the property to Cuba without arranging for it beforehand? If the defendants had refused, as it was their right to refuse, and it would seem certain or at least extremely probable that they would refuse, this most hazardous service if previous arrangement had not been made, what would have been the situation of the men and the property? The expedition would have failed. The men would have been subject to arrest and the property to sacrifice. Is it probable that those in charge of such an enterprise would take the men and property to this point, without having secured certain means of transportation for it in advance? The captain says he was ignorant of the service required of him until he reached the point near Barnegat. You must judge whether he should be believed or not, and from all the evidence must determine whether the defendants left here with knowledge of and provision for what they were about to do.

"I now submit the case to you, reminding you of its impor-

tance. If the evidence of the defendants' guilt is not entirely clear, they should be acquitted. If it is thus clear, they should certainly be convicted. No sympathy or prejudice must be allowed to influence your minds in passing on this case. We have nothing to do with the controversies between the people of Cuba and the government of that island. We are concerned only with the execution of the law in this case. We have only to consider whether the statute to which your attention has been called has been violated. It is our duty to see that the law is honestly and justly executed; that is all. The peace and safety of the community so manifestly depend upon the faithful and honest administration of the law, that no man can fail to see it. We are suffering to-day, as probably no other people suffers, from lawlessness, from mobs, lynch law, murder, violation of trusts, as the result of want of faithfulness in executing the law.

"You will take the case and decide it with a careful regard to the rights of the defendants." 73 Fed. Rep. 159.

No motion or request was made that the jury be instructed to find for defendants or either of them.

Defendants excepted "to that part of the charge of the court giving the definition of a military expedition;" to the refusal of the court "to read the points that were not read to the jury," "to affirm all the points without qualification," and "to affirm each point without qualification;" to "the statement of the court that in its opinion this was a military expedition;" and "that the men were armed;" to "the failure of the court to comment on the evidence on behalf of the defendants;" to the statements "of the court in reference to the reasons, motives, purposes, and acts of the defendants;" "that the defendants did not express surprise that the men came on the vessel off Barnegat;" and "that the declarations of the men on the ship to the witnesses for the government were evidence against the defendants;" also to the statements "that even if an agreement to furnish and provide the means of transportation was made within the jurisdiction of the United States to carry on a military expedition which was not consummated until they got outside of the three mile

limit, that constituted an offence against the laws of the United States;" and "that the acts and declarations of the Cubans themselves were evidence against them all as to the nature of the expedition."

The motion in arrest was based on the alleged want of jurisdiction of the court. Errors were assigned to the giving, refusing and qualification of instructions; to the admission in evidence of declarations of some of the party, during the voyage, as to their destination; and to the overruling of defendants' motion in arrest of judgment for want of jurisdiction.

*Mr. W. Hallett Phillips* and *Mr. William W. Kerr* for plaintiffs in error.

*Mr. Attorney General, Mr. Solicitor General* and *Mr. Assistant Attorney General Whitney* for defendants in error.

MR. CHIEF JUSTICE FULLER, after stating the case, delivered the opinion of the court.

Title LXVII of the Revised Statutes, headed "Neutrality," embraces eleven sections, from 5281 to 5291, inclusive. Section 5281 prohibits the acceptance of commissions from a foreign power by citizens of the United States within our territory to serve against any sovereign with whom we are at peace. Section 5282 prohibits any person from enlisting in this country as a soldier in the service of any foreign power and from hiring or retaining any other person to enlist or to go abroad for the purpose of enlisting. Section 5283 deals with fitting out and arming vessels in this country in favor of one foreign power as against another foreign power with which we are at peace. Section 5284 prohibits citizens from the fitting out or arming, without the United States, of vessels to cruise against citizens of the United States; and section 5285, the augmenting of the force of a foreign vessel of war serving against a friendly sovereign. Sections 5287 to 5290 provide for the enforcement of the preceding sections, and section 5291, that the provisions set forth shall not be construed to prevent the enlistment of certain foreign citizens in the United States.

Section 5286 is as follows:

"Every person who, within the territory or jurisdiction of the United States, begins, or sets on foot, or provides or prepares the means for, any military expedition or enterprise, to be carried on from thence against the territory or dominions of any foreign prince or State, or of any colony, district or people, with whom the United States are at peace, shall be deemed guilty of a high misdemeanor, and shall be fined not exceeding three thousand dollars, and imprisoned not more than three years."

This section was originally section five of an act approved June 5, 1794, 1 Stat. 381, c. 50, carried forward as section six of an act of April 20, 1818, 3 Stat. 447, c. 88, and differs therefrom in no respect material here. The language of the section closely follows the recommendation of President Washington in his annual address December 3, 1793, when he said: "Where individuals shall . . . enter upon military expeditions or enterprises within the jurisdiction of the United States . . . these offences cannot receive too early and close an attention, and require prompt and decisive remedies." Annals 3d Congress, 1793–95, 11. The legislation is historically considered in Dana's Wheaton, § 439, note. The statute was undoubtedly designed in general to secure neutrality in wars between two other nations, or between contending parties recognized as belligerents, but its operation is not necessarily dependent on the existence of such state of belligerency. 13 Ops. Attys. Gen. 177, 178. Section 5286 defines certain offences against the United States and denounces the punishment therefor, but, although a penal statute, it must be reasonably construed, and not so as to defeat the obvious intention of the legislature. *United States* v. *Lacher*, 134 U. S. 624, 628.

The offence is defined disjunctively as committed by every person who, within our territory or jurisdiction, "begins, *or* sets on foot, *or* provides *or* prepares the means for, any military expedition *or* enterprise, to be carried on from thence."

This indictment charged that defendants did "begin, set on

foot, *and* provide *and* prepare the means for a certain military expedition *and* enterprise."

Defendants' counsel did not seek to compel an election, nor in any manner, by their motion in arrest or otherwise, to raise the question of duplicity, nor do they now make objections to the proceedings on this ground. The district judge instructed the jury that the evidence would not justify a conviction "of anything more than providing the means for or aiding such military expedition by furnishing transportation for their men, their arms, baggage," etc. Under these circumstances, the verdict cannot be disturbed on the ground that more than one offence was included in the same count of the indictment, but it must be applied to the offence to which the jury were confined by the court. *Crain* v. *United States,* 162 U. S. 625.

We think that it does not admit of serious question that providing or preparing the means of transportation for such a military expedition or enterprise as is referred to in the statute is one of the forms of provision or preparation therein denounced. Nor can there be any doubt that a hostile expedition dispatched from our ports is within the words "carried on from thence." The officers of the Horsa were concerned in providing the means of transportation.

1. The first and the main question in the present case is whether the trial judge erred in his instructions to the jury in respect of what constitutes a "military expedition or enterprise" under the statute. The question is one of municipal law, and the writers on international law afford no controlling aid in its solution. They deal principally with the status of belligerents, and the rights and obligations of neutral nations when the existence of such a status is formally recognized or accepted as existing *de facto.*

Calvo defines a military expedition as being an armed enterprise against a country, and he gives the expedition of Xerxes as an illustration. Dict. de Droit Int. verbo, Expédition Militaire.

Professor Lawrence (Prin. Int. Law, 1895, p. 508) is quoted by counsel to the effect that, to constitute a warlike expedi-

tion, "it must go forth with a present purpose of engaging in hostilities; it must be under military or naval command; and it must be organized with a view to proximate acts of war. But it need not be in a position to commence fighting the moment it leaves the shelter of neutral territory; nor is it necessary that its individual members should carry with them the arms they hope soon to use. When a belligerent attempts to organize portions of his combatant forces on neutral soil or in neutral waters, he commits thereby a gross offence against the sovereignty of the neutral government, and probably involves it in difficulties with the other belligerent, who suffers in proportion to his success in his unlawful enterprise."

In Hall's Rights and Duties of Neutrals, § 22, it is said: "In the case of an expedition being organized in and starting from neutral ground, a violation of neutrality may take place without the men of whom it is composed being armed at the moment of leaving. . . . On the other hand, the uncombined elements of an expedition may leave a neutral state in company with one another, provided they are incapable of proximate combination into an organized whole."

Boyd in his edition of Wheaton's International Law, § 439*aa*, says: "It is impossible to lay down any hard and fast line separating commercial transactions in munitions of war, and the organizing of hostile expeditions. International law is necessarily incapable of being defined and laid down with the precision attainable by municipal law. The question is one of intent, and it is the duty of a neutral government to exercise due diligence in ascertaining what the real character of the transaction may be. The elements of a hostile expedition are thus described by Professor Bernard: 'If at the time of its departure there be the means of doing any act of war, — if those means, or any of them, have been procured and put together in the neutral port, — and if there be the intention to use them (which may always be taken for granted when they are in the hands of the belligerent), the neutral port may be justly said to serve as a base or point of departure for a hostile expedition.' Montague Bernard, Neutrality of Great Britain, p. 399."

But this statute is to be construed as other domestic legislation is, and its meaning is to be found in the ordinary meaning of the terms used. The definitions of the lexicographers substantially agree that a military expedition is a journey or voyage by a company or body of persons, having the position or character of soldiers, for a specific warlike purpose; also the body and its outfit; and that a military enterprise is a martial undertaking, involving the idea of a bold, arduous and hazardous attempt. The word "enterprise" is somewhat broader than the word "expedition"; and although the words are synonymously used, it would seem that under the rule that its every word should be presumed to have some force and effect, the word "enterprise" was employed to give a slightly wider scope to the statute.

The phrase "military expedition or enterprise" has been variously construed by the District Courts, but apparent differences in expression may be largely attributable to the differences in the facts under consideration in the particular case.

In *United States* v. *O'Sullivan*, 2 Whart. Crim. Law, § 2802, 4th ed. note, Judge Judson charged the jury that before they could "convict on this indictment, it must be proved to their satisfaction that the expedition or enterprise was in its character military; or, in other words, it must have been shown by competent proof that the design, the end, the aim and the purpose of the expedition, or enterprise, was some military service, some attack or invasion of another people or country, State or colony as a military force. . . . But any expedition or enterprise in matters of commerce, or of business of a civil nature, unattended by a design of an attack, invasion or conquest, is wholly legal, and is not an expedition or an enterprise within this act. . . . The term 'expedition' is used to signify a march or voyage with martial or hostile intentions. The term 'enterprise' means an undertaking of hazard, an arduous attempt."

Judge Maxey in *United States* v. *Ybanez*, 53 Fed. Rep. 536, concurred in this view and further said: "This statute does not require any particular number of men to band together to constitute the expedition or enterprise one of a mili-

tary character. There may be divisions, brigades and regiments, or there may be companies or squads of men. Mere numbers do not conclusively fix and stamp the character of the expedition as military or otherwise. A few men may be deluded with the belief of their ability to overturn an existing government or empire, and, laboring under such delusion, they may enter upon the enterprise. . . . The proof must establish in your minds the fact that the expedition or enterprise was of a military character; and when evidence shows that the end and object were hostile to or forcible against the Republic of Mexico, then it would be, to all intents and purposes, a military expedition. . . . Evidence showing that the end and objects were hostile to or forcible against a nation at peace with the United States characterizes it, to all intents and purposes, as a military expedition or enterprise."

Judge Brawley, in *United States* v. *Hughes*, not yet reported, applied the test suggested by Mr. Hall as to capability of proximate combination of the uncombined elements of an expedition into an organized whole; and he said in reference to the passengers in that case: "But if after they got aboard they took the arms from the boxes, and organized into a company or organization, if they were drilled or went through the manual of arms under the leadership or direction of one man or more, if they themselves became a military organization by reason of such coming together, and of such drill or instruction, then from that time forth they would be a military organization or enterprise within the meaning of this statute."

In *United States* v. *Pena*, 69 Fed. Rep. 983, Judge Wales, and in *United States* v. *Hart*, not yet reported, Judge Brown, of the Southern District of New York, considered the statute as exacting a high degree of organization, but Judge Brown said : "I do not say that in order to constitute a military expedition to be 'carried on from this country,' as the statute reads, it must be complete at the start, or possess all the elements of a military body. It is sufficient if there was a combination by the men for that purpose, with the agreement and

the intention of the body that embarks that it should become a military body before reaching the scene of action. Such a combination and agreement, if means for effecting it were provided, followed by embarcation in pursuance of the agreement, would show such a partial execution of the design on our soil, as to bring the case within our statute, as 'a military enterprise begun and carried on from the United States.'"

It is argued that as persons are not prohibited from going abroad for the purpose of enlisting in the service of a foreign army; and as the transportation of arms, ammunition and munitions of war from this country to any other foreign country is not unlawful, 3 Whart. Int. Law Dig. § 388 *et seq.; The Itata*, 15 U. S. App. 1, and authorities cited; therefore no offence was committed in the transportation of these men, the arms and munitions; and reference is made to an opinion of Mr. Secretary Fish on this subject during the Franco-German war of 1870. A statement of that matter is given in Hall's Rights and Duties of Neutrals, § 22, and in a letter of Sir Edward Thornton to Lord Granville, dated September 26, 1870, 61 State Papers, 1870–71, p. 822, and elsewhere. It seems to have been an informal communication to the Prussian Minister, who had complained of the fact that the transatlantic steamer Lafayette was carrying a large cargo of arms and ammunition for sale to the French, while at the same time she was carrying several hundred French passengers, all of whom, as was generally supposed, intended to enlist in the army of France on their arrival. These passengers, however, appear to have been all travelling as individuals without any concert of action, and they had no access to the arms and ammunition any more than an ordinary passenger on an ocean steamer has access to any part of the cargo. Sir Edward Thornton wrote that "Mr. Fish replied to the District Attorney that he was to be guided by the neutrality laws of the United States, and that with regard to the ship it could not be alleged that she was intended for hostile purposes against North Germany. As for the arms and ammunition, they were articles of a legitimate commerce, with which the United States would not interfere, although the vessel might

run the risk of being detained by the cruisers of North Germany on her voyage to France."

The district judge ruled nothing to the contrary and charged the jury in this case that it was not a crime or offence against the United States under the neutrality laws of this country for individuals to leave the country with intent to enlist in foreign military service, nor was it an offence against the United States to transport persons out of this country and to land them in foreign countries when such persons had an intent to enlist in foreign armies; that it was not an offence against the laws of the United States to transport arms, ammunition and munitions of war from this country to any foreign country, whether they were to be used in war or not; and that it was not an offence against the laws of the United States to transport persons intending to enlist in foreign armies and munitions of war on the same trip. But he said that if the persons referred to had combined and organized in this country to go to Cuba and there make war on the government, and intended when they reached Cuba to join the insurgent army and thus enlist in its service, and the arms were taken along for their use, that would constitute a military expedition, and the transporting of such a body from this country for such a purpose would be an offence against the statute. The judge also charged the jury as follows:

"In passing on the first question, it is necessary to understand what constitutes a military expedition within the meaning of this statute. For the purposes of this case, it is sufficient to say that any combination of men organized here to go to Cuba to make war upon its government, provided with arms and ammunition, we being at peace with Cuba, constitutes a military expedition. It is not necessary that the men shall be drilled, put in uniform, or prepared for efficient service, nor that they shall have been organized as or according to the tactics or rules which relate to what is known as infantry, artillery or cavalry. It is sufficient that they shall have combined and organized here to go there and make war on a foreign government, and to have provided themselves with the means of doing so. I say 'provided themselves with

the means of doing so,' because the evidence here shows that the men were so provided. Whether such provision, as by arming, and so forth, is necessary need not be decided in this case. I will say, however, to counsel that were that question required to be decided I should hold that it is not necessary.

" Nor is it important that they intended to make war as an independent body or in connection with others. Where men go without combination and organization to enlist as individuals in a foreign army, they do not constitute such military expedition, and the fact that the vessel carrying them might carry arms as merchandise would not be important."

It appears to us that these views of the district judge were correct as applied to the evidence before him. This body of men went on board a tug loaded with arms; were taken by it thirty or forty miles and out to sea; met a steamer outside the three mile limit by prior arrangement; boarded her with the arms, opened the boxes and distributed the arms among themselves; drilled to some extent; were apparently officered; and then, as preconcerted, disembarked to effect an armed landing on the coast of Cuba. The men and the arms and ammunition came together; the arms and ammunition were under the control of the men; the elements of the expedition were not only "capable of proximate combination into an organized whole," but were combined or in process of combination; there was concert of action; they had their own pilot to the common destination; they landed themselves and their munitions of war together by their own efforts. It may be that they intended to separate when they reached the insurgent headquarters, but the evidence tended to show that until that time they intended to stand together and defend themselves if necessary. From that evidence the jury had a right to find that this was a military expedition or enterprise under the statute, and we think the court properly instructed them on the subject. This conclusion disposes of most of the errors assigned to the instructions given, qualified or refused. Some of the points requested on defendants' behalf were incorrect; some were covered by the general charge; and others were properly qualified.

2. The second material question is, whether if a military expedition or enterprise was made out, the court erred in its instructions in respect of defendants' knowledge or notice of the facts. And this involves the jurisdictional question which is raised by the exception to the qualification of the twelfth point. In that qualification and elsewhere, the district judge specifically and clearly instructed the jury that although this was a military expedition or enterprise, nevertheless the defendants were not criminally responsible unless they were aware of its nature before they sailed from Philadelphia. "To convict the defendants," said the district judge, "it is necessary that the government shall have satisfied your minds beyond a reasonable doubt that this was a military enterprise, and that the defendants when they started knew it. Otherwise they are not guilty." "The question, therefore, is: Did the defendants understand that they were to carry this expedition, and had provided for it, and understand what the expedition was before leaving *here* [Philadelphia]?" It is true that the expedition started in the Southern District of New York, and did not come into immediate contact with defendants at any point within the jurisdiction of the United States, as the Horsa was a foreign vessel; but the Horsa's preparation for sailing and the taking aboard of the two boats at Philadelphia constituted a preparation of means for the expedition or enterprise, and if defendants knew of the enterprise when they participated in such preparation, then they committed the statutory crime upon American soil, and in the Eastern District of Pennsylvania, where they were indicted and tried.

The jurisdictional point was again presented by the motion in arrest, but its disposition calls for no further observations.

We repeat that on the second material question, namely, whether the defendants aided the expedition with knowledge of the facts, the jury were instructed that they must acquit unless satisfied beyond reasonable doubt that defendants, when they left Philadelphia, had knowledge of the expedition and its objects and had arranged and provided for its transporta-

tion. We hold that defendants have no adequate ground of complaint on this branch of the case.

3. An exception was taken to the statement of the court that the men were armed. The court said: "They were armed, having rifles and cannon, and were provided with ammunition and other supplies." This statement was based on uncontradicted testimony, and occurring as it did in a recapitulation of the evidence, no rule of law being incorrectly stated and the matters of fact being specifically submitted to the determination of the jury, we do not regard the exception as tenable. *Baltimore & Potomac Railroad* v. *Fifth Baptist Church*, 137 U. S. 568, 574.

4. Objection is also made because the court expressed its opinion that this was a military expedition. But what the court said was that this "would seem to the court to be free from reasonable doubt. The question, however, is one for your determination alone, and I submit it to you as such, reminding you that the responsibility of deciding it rests upon you only. If you find that this was not a military expedition, or, rather, if you are not fully satisfied that it was, your verdict will be for defendants without going further." Clearly the observation of the court thus guarded did not so trespass on the province of the jury as to constitute reversible error. *Simmons* v. *United States*, 142 U. S. 148, 155.

5. Again, it is urged that the court erred, when referring to the captain's testimony that "he was ignorant of the service required of him until he reached the point near Barnegat," in saying : "You must judge whether he should be believed or not, and from all the evidence must determine whether the defendants left here with the knowledge of, and provision for, what they were about to do." No exception was taken to this part of the charge ; but if there had been, we cannot say that the trial judge was not justified in that remark in view of all the facts and circumstances.

Nor was any exception taken to the closing observations by the court as to the importance of faithfulness in the execution of the law, although they are now assigned for error. We see

in them nothing which could properly be regarded as prejudicial to the defendants.

6. Other assignments of error relate to the admissibility of declarations of members of the party, during the voyage, as to their destination. One of the witnesses for the prosecution testified on cross-examination "that he had spoken to a couple of those young fellows there, and they said they were going to Cuba." On redirect examination he was asked : "Did they tell you where they were going?" The answer, which was objected to, was: "They told me they were going to Cuba. They did not say what they were going to do." It was uncontroverted in the case that the party meant to go and did go to Cuba, and the evidence was not material. Another witness for the government was asked : "Q. Did you have any talk with any of those men? Objected to unless it was in the presence of these defendants. Objection overruled. Exception by defendants. A. Yes, sir. I was going in the forecastle one night and he told us, 'I go down to Cuba to fight.' Q. To fight whom? A. The Spanish."

There was no objection to the second question, or to either answer, and no motion to strike out. It does not appear who made the statement or how many persons were present, or that defendants were not present. These assignments are without merit.

There was other evidence of declarations of members of the party as to their purposes, and the district judge in commenting thereon said that: "If these men were in combination to do an unlawful act, what was said by any of them at the time in carrying out their purpose was evidence against them all as to the nature of the expedition," and to this an exception was taken. The general rule was stated in *American Fur Co. v. United States*, 2 Pet. 358, 365, by Mr. Justice Washington, speaking for the court, that "where two or more persons are associated together for the same illegal purpose, any act or declaration of one of the parties, in reference to the common object, and forming a part of the *res gestæ*, may be given in evidence against the others." The declarations must be made in furtherance of the common object, or must constitute a part

of the *res gestæ* of acts done in such furtherance. Assuming a secret combination between the party and the captain or officers of the Horsa had been proven, then, on the question whether such combination was lawful or not, the motive and intention, declarations of those engaged in it explanatory of acts done in furtherance of its object came within the general rule and were competent. *St. Clair* v. *United States,* 154 U. S. 134; *People* v. *Davis,* 56 N. Y. 95, 102; *Lincoln* v. *Claflin,* 7 Wall. 132, 139; 1 Greenl. Ev. § 111; Starkie Ev. 466.

The extent to which evidence of this kind is admissible is much in the discretion of the trial court, and we do not consider that that discretion was abused in this instance. *Clune* v. *United States,* 159 U. S. 590, 592.

7. No motion or request was made that the jury be instructed to find for defendants or either of them. Where an exception to a denial of such a motion or request is duly saved, it is open to the court to consider whether there is any evidence to sustain the verdict, though not to pass upon its weight or sufficiency. And although this question was not properly raised, yet if a plain error was committed in a matter so absolutely vital to defendants, we feel ourselves at liberty to correct it.

The Horsa was bound for Jamaica, and her course carried her along the coast of Cuba for about six hours. She took on board at Philadelphia two boats entered on the manifest as for Port Antonio, but intended for and ultimately devoted to the use of the party she transported. The captain received at the wharf written instructions, which he did not produce on the trial, and says he did not keep when he left the vessel, but in accordance with which he went north off Barnegat, anchored outside the three mile limit, and awaited orders. The inference was not unjustifiable that he was thus and then informed that safety required that whatever was to take place off Barnegat should take place beyond the jurisdiction of the United States, in other words, that a transgression of the laws of the United States was contemplated. The Horsa was boarded on the high seas off Barnegat as heretofore described, and the captain testified that he did not regard the occurrence

as anything unusual or important. But the firemen said that they went to the chief engineer, when these men came aboard, and told him they would not go along. "We won't go down there and get shot." "We did not sign for that." The chief engineer bade them keep quiet, and the captain "told them if anybody had to hang for this I would be the man to hang for it. I told them they had better go below and mind their own business." The written instructions the captain there received were not produced, but he said he was to take the men and whatever they had and let them off when told to do so, delivering the two boats shipped at Philadelphia, and the two shipped from the tug, to them as soon as called for; and that this did not strike him as singular. The evidence shows that the nature of the enterprise was apparent at this time, and the jury may not unreasonably have inferred that the captain received the men and their arms, entered upon the hazards of the voyage, and quieted the complaints of the firemen, with an equanimity springing from a mind previously made up on the subject. We deem it unnecessary to go over the evidence. We cannot say as matter of law that there was no evidence tending to sustain the verdict against the captain.

But we think the case as to Petersen and Johansen stands on different ground, and that we may properly take notice of what we believe to be a plain error, although it was not duly excepted to. These men were the mates of the vessel, and they proceeded on the voyage under the captain's orders. This would not excuse them if there were proof of guilty knowledge or participation on their part in assisting a military expedition or enterprise when they left Philadelphia. We are of opinion that adequate proof to that effect is not shown by the record, and that as the case stood the jury should have been instructed to acquit them. The captain testified that the mates "had nothing to do with this ship or with its business. They listened to my orders; they were under my orders. I was the master of that vessel. I am responsible for all that was done." The order he received to go north and await orders beyond the three mile limit does

not appear to have been communicated to them ; and whatever they must have known after the Horsa was boarded off Barnegat, there is nothing sufficiently justifying a presumption of knowledge when the vessel left the wharf.

It is not necessary to enlarge upon the public importance of the neutrality laws. This case is a criminal case arising on an indictment under a section of the Revised Statutes, and we dispose of it on what we deem to be the proper construction of that section, and after subjecting the correctness of the rulings of the court below to that careful examination which the discharge of our duty required.

*The judgment against defendant Wiborg is affirmed; the judgment against defendants Petersen and Johansen is reversed, and the cause remanded with instructions to set aside the verdict and grant a new trial as to them.*

MR. JUSTICE HARLAN dissenting.

I concur with my brethren in holding that the judgment against Petersen and Johansen should be reversed, and a new trial ordered as to them.

But I am of opinion that the judgment against Wiborg should also be reversed. It is conceded that the men on the tug were received on board the Horsa at a point off Barnegat which was more than three miles from our shore. It is clear from the evidence that at the time his vessel left Philadelphia, and previous to his receiving those men on board, Wiborg had no knowledge of the purpose for which the charterer ordered him, after he passed the Breakwater, "to proceed north near Barnegat and wait further orders." The movements of the vessel were under the control of the charterer. Wiborg was under no legal obligation to inquire from the charterer why the Horsa was ordered to that point, or what were the orders he was likely to receive after arriving there. His duty was to obey the orders of the charterer, unless such orders obviously contemplated a breach of the laws of this country. The only evidence in the case bearing upon the question whether Wiborg knew, when he left Philadelphia, of

any arrangement for his vessel, after it passed beyond the territory and jurisdiction of the United States, to receive men destined for Cuba, was that given by himself. And he distinctly swore that when he started from Philadelphia he did not know that " we were going to take these people and their goods on the Horsa." There was not the slightest ground in the evidence to suppose that he ever had any communication with those people, or that he ever saw them, before they came on his vessel. Those persons had, of course, arranged with the charterer for passage on the Horsa. But the charterer did not communicate the fact of such an arrangement to the captain of the vessel while he was within the territory and jurisdiction of the United States. The direction that he should receive the men and their goods on board came to him, from the charterer, when he was not within the territory or jurisdiction of the United States. He cannot, therefore, be said to have provided or prepared, " within the territory or jurisdiction of the United States," any means for the expedition or enterprise against the territory or dominion of Spain. Under the interpretation placed upon the statute by the government, the charterer did provide for such means. But, curiously enough, the charterer was not indicted. The prosecution is against the officers of the vessel, no one of whom, according to the proof, had any knowledge, at the time the Horsa left Philadelphia, nor while it was within the jurisdiction of the United States, that the charterer had arranged that the vessel, after it got beyond the jurisdiction of the United States, should receive on board individuals destined for Cuba, and who intended, after they arrived there, to engage in the struggle to overthrow the authority of Spain in that island.

Independently of the view just expressed, this was not, I think, a military expedition or enterprise within the meaning of the statute. It had none of the features of such an expedition or enterprise. There was no commanding officer, whose orders were recognized and enforced. It was, at most, a small company of persons, no one of whom recognized the authority of another, although all desired the independence of Cuba, and had the purpose to reach that island, and engage,

not as a body, but as individuals, in some form, in the civil war there pending — a loose, unorganized body, of very small dimensions, and without any surroundings that would justify its being regarded as a military expedition or enterprise to be carried on from this country.