## SYKES v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. April 25, 1913.)

No. 3,860.

*(Syllabus by the Court.)*

1. CRIMINAL LAW (§ 780*)—EVIDENCE—TESTIMONY OF ACCOMPLICES—CORROBORATION REQUISITE.

"It is unodubtedly the better practice for courts to caution juries against too much reliance upon the testimony of accomplices and to require corroborating testimony before giving credence to them."

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1859–1863; Dec. Dig. § 780.*]

2. CRIMINAL LAW (§ 510*)—ACCOMPLICES—CORROBORATION—EVIDENCE OF IDENTITY AND CONNECTION REQUISITE.

Other evidence than that of an accomplice or perpetrator, identifying and connecting the accused with the crime as one of the perpetrators or instigators thereof, is essential to constitute such a corroboration of the testimony of the accomplice or criminal as renders it safe or prudent to convict.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1124–1126; Dec. Dig. § 510.*]

3. CRIMINAL LAW (§ 508*)—EVIDENCE OF CRIMINAL INSUFFICIENT.

The uncorroborated, contradictory, contradicted testimony of a confessed criminal, induced by hope of immunity, that the accused, who was not present when the crime was committed, was one of its perpetrators or instigators, does not constitute substantial evidence of that fact, which will sustain a conviction.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1099–1123; Dec. Dig. § 508.*]

4. CRIMINAL LAW (§ 1036*)—APPEAL AND ERROR—REVIEW WITHOUT OBJECTIONS OR EXCEPTIONS WHEN ALLOWED.

In criminal cases, in which the life or the personal liberty of the defendant is at stake, the courts of the United States, in the exercise of a sound discretion, may notice such a grave error as the absence of substantial evidence to sustain the conviction, although the question it presents was not properly raised in the trial court by request, objection, exception, or assignment of error.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1631–1640, 2639–2641; Dec. Dig. § 1036.*]

In Error to the District Court of the United States for the Eastern District of Missouri; David P. Dyer, Judge.

Charles Sykes was convicted of burglary, and brings error. Reversed and remanded.

Edward Higbee, of Lancaster, Mo. (Higbee & Mills, of Lancaster, Mo., on the brief), for plaintiff in error.

Homer Hall, Asst. U. S. Atty., of St. Louis, Mo. (Charles A. Houts, U. S. Atty., of St. Louis, Mo., on the brief), for the United States.

Before SANBORN, Circuit Judge, and WILLIAM H. MUNGER and TRIEBER, District Judges.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

SANBORN, Circuit Judge. The writ in this case challenges the trial and conviction of Charles Sykes for breaking into a post office building at Kirksville, in the state of Missouri, on August 23, 1911, and feloniously taking therefrom four mail bags. The question which the record in this case has persuaded us to consider is the existence of any substantial evidence to sustain this conviction. The evidence in the record discloses these facts:

Sykes was a resident and citizen of Knox county, in the state of Missouri and had lived in the vicinity of Hurdland, a few miles from Kirksville, for about three years. He was a dealer in horses, and a man of good reputation for honor and integrity. He was indicted and tried with Bert L. Burnhardt, H. B. Sims, and Mrs. Minnie Callahan. Each of these three defendants testified that he or she had never made the acquaintance of Sykes until after the robbery, and Sykes was not in Kirksville when the robbery was committed. Burnhardt was a young man who had been in Kirksville about three weeks. He was, and had been for some time, an intimate acquaintance of Mrs. Callahan, and she came at his request to the hotel in Kirksville, where he met her the day before the robbery. He was also acquainted with Sims, and neither of the three seems to have had any abiding place. The post office was robbed about 11 o'clock at night on August ·23, 1911. Sykes, Burnhardt, and Sims testified that Sykes had nothing to do with it, and his conviction is founded upon the testimony of Mrs. Callahan alone, who pleaded guilty to the charges and was sentenced on May 30, 1912, to confinement in jail for three months, to date from February 28, 1912, and to pay a fine of $100, so that she was in effect discharged after the verdict, while Sykes was sentenced to pay a fine of $100 and to be confined in the penitentiary five years, and each of the other defendants to pay a fine of $100 and to be confined in the penitentiary four years. Three of the stolen mail bags were found near the post office a few hours after the robbery, and, on September 4, 1911, a workman mowing weeds on the side of the railroad embankment about 200 yards from the railroad station in Kirksville, found the fourth bag and many of its contents, and his find was immediately published. Two days after the robbery, on August 25, 1911, Mrs. Callahan made an affidavit before a post office inspector that she, Burnhardt, and Sims took supper together at the hotel in Kirksville on August 23, 1911, that she and Burnhardt spent from 8 p. m. until 10 p. m. that night together talking with a Mrs. Shelton, a keeper of a boarding house on McPherson street, in Kirksville, concerning renting some rooms; that after this conversation they walked around in the vicinity of the post office, and saw in the distance Sims and one Tholman. She said nothing in this affidavit about Sykes. The next day Burnhardt made an affidavit to the same effect.

In October, 1911, Mrs. Callahan was arrested, and was thereafter confined in jail about 35 days on the charge that she had forged the name of Sykes to a check for $100, a charge which was still pending against her at the time of the trial below. At the expiration of the 35 days she was released from the jail on bail, and two witnesses testified that upon her release she declared she would have revenge on Sykes, and would put him in jail with the others; but she denied

that she made this statement. On November 8, 1911, she made a second affidavit before a post office inspector, in which she testified that she did not see Burnhardt any more the night of the robbery after she returned with him from Mrs. Shelton's and entered the hotel; that the first she knew of the robbery was learned by overhearing a conversation between Burnhardt and Sims concerning it at the hotel the next morning after its commission; that she went to Burnhardt's room that morning after hearing this talk and found the mail bag under the mattress in his room; that between August 22 and October 16, 1911, she was out and took beer with Sykes a number of times; that on September 2, 1911, on his invitation, she took a ride in a buggy with him in the afternoon; that he had a mail bag in a gunny sack in this buggy; that he took it out of the buggy, took the gunny sack off of it, carried the mail bag along the railroad embankment several yards, and hid it in the weeds on the side of the railroad; that they returned to Kirksville from their ride about six in the afternoon; and that afterwards Sykes gave her a check for $100 to go away. She rested a month, and then on December 7, 1911, made a third affidavit before a post office inspector in which she testified that Burnhardt asked her to go to Kirksville, and she arrived at the hotel there at 4 in the afternoon of August 22, 1911, that Burnhardt came to her in the hotel an hour later, that the plan for the robbery was made that night, that Burnhardt said that he and Sims were to rob the post office for a third party for $50 each, that their plan was that she was to watch in the alley near the post office while they committed the robbery, that on the next night they executed this plan, that after taking the sacks they cut open three of them and put their contents into the fourth, that Sims brought the fourth bag into her room in the hotel that night through the window, and that he and Burnhardt took it thence to the latter's room.

At the trial she repeated her story of the hiding of the mail bag by Sykes, of the robbery, and of the statement by Burnhardt that he and Sims were hired to commit it, which she had told in her third affidavit, and testified that at Macon, on the 10th of September, 1911, Sykes paid Burnhardt $25 and told her that he gave Burnhardt and Sims $50 apiece for going into the post office. She also testified that she reported the robbery to the officials after she found out that she was charged with forging the check by Sykes. Burnhardt, Sims, and Sykes testified that it was not true that Sykes hired or paid Burnhardt or Sims to commit the robbery, that Mrs. Callahan's story about their statements in this regard and about the payment of the money by Sykes to Burnhardt were false, and that Sykes had nothing to do with the crime. Sykes and two other witnesses testified that he was not in Kirksville, but was at Brookfield, and that he there purchased and gave two checks, which were in evidence at the trial, for horses on September 2, 1911, the day when Mrs. Callahan testified that he hid the mail bag in her presence, and Sykes testified that there was no truth in her story about his carrying it and hiding it.

The mail bag had been found on the side of the railroad embankment on September 4, 1911, and that fact was known to her more

than three months before she first testified, in her third affidavit on December 7, 1911, that Sykes put it there. In the same affidavit she testified that he took a gunny sack, which she subsequently testified Burnhardt had procured to cover the mail bag, from the mail bag, and threw it down by the side of the public road at the time when he hid the mail bag. Witnesses testified that after she made this affidavit they went to the place where she testified Sykes threw the gunny sack and found one there, and this testimony is claimed to be corroborative of her evidence. But it is not so, because it does not identify or connect Sykes with the mail bag, or the gunny sack, or the crime as the perpetrator thereof, and that is the only part of her bag-hiding story that was material to the issue tried. She may have placed the gunny sack there herself, some stranger may have done so, and she may have seen it there on some of her rides. Burnhardt, who she says procured the gunny sack, may have hidden the mail bag and thrown the gunny sack where it was found, and he may have told her that he did so, or she may have seen him do it. The fact that the mail bag and the gunny sack were found where she said Sykes placed them, while it tended to show that this confessed criminal knew where the gunny sack was placed, had no more tendency to prove that Sykes put them there than it had to prove that any member of the jury, or any other innocent man did so. Wharton in the ninth addition of his work on Criminal Evidence, in section 442, says:

"The corroboration requisite to validate the testimony of an alleged accomplice should be to the person of the accused. Any other corroboration would be delusive, since, if corroboration in matters not connecting the accused with the offense were enough, a party, who on the case against him would have no hope of an escape, could, by his mere oath, transfer to another the conviction hanging over himself."

A demonstration by reason and authority that this is the just and rational rule may be found in State v. Chyo Chiagk, 92 Mo. 415, 417, 4 S. W. 704. To the same effect are United States v. Ybanez (C. C.) 53 Fed. 536, 540; Commonwealth v. Hayes, 140 Mass. 366, 369;[1] Commonwealth v. Holmes, 127 Mass. 424, 34 Am. Rep. 391; McNeally v. State, 5 Wyo. 59, 68, 36 Pac. 824. In the case last cited an accomplice stated that he and the defendant, McNeally, killed a cow belonging to another, and hid the brands and the hide at a certain place near McNeally's ranch, and he went with the officers where he testified they were hidden, and they there found them. The Supreme Court of Wyoming held that the finding of the brands and the hide where the accomplice testified they were was not corroborative of the testimony of the accomplice as to the guilt of the defendant. It is the settled law of Missouri that evidence that does not identify and connect the accused with the crime charged is not corroborative of the testimony of an accomplice as to matters material to the issue, and that a charge to the jury on this subject is defective and erroneous which does not so state. State v. Miller, 100 Mo. 606, 622, 623, 13 S. W. 832, 1051; State v. Walker, 98 Mo. 95, 109, 9 S. W. 646, 11 S. W. 1133. The finding of the mail bag and the gunny sack constituted no corroboration of the testimony of Mrs. Callahan in any

[1] 5 N. E. 264.

matter material to the issue, and the record does not contain an iota of other evidence in corroboration thereof.

Mrs. Callahan's story that on a bright afternoon in September a robber took her and his captured spoils in a buggy to a place in the public road, where she held the horse while he took the spoils from the buggy, uncovered them, threw the covering down near the public road, carried the spoils for many yards along a railroad embankment in plain sight from the public road and from several houses in the vicinity, and then threw them down by the side of the embankment in the weeds, is incredible. All her statements in any way tending to show Sykes' connection with her crime, concerning which three of her accomplices or any other witness testified, are contradicted by them. She contradicted her own testimony. She testified in the second affidavit that she first learned of the robbery by overhearing a conversation between Burnhardt and Sims the morning after its commission. She testified in her third affidavit and on the stand that she participated in the plan which was made to commit the robbery the night before it was perpetrated, that she stood guard when it was done, and that she received the spoils and her confederates into her room at the hotel that night. One of these statements is false. Sykes was not present at the robbery. Strike down Mrs. Callahan's testimony, and there is nothing to connect him with it.

[1] It is only when the evidence is sufficient to convince of the guilt of the accused beyond a reasonable doubt that one may lawfully be convicted of a crime. "It is undoubtedly the better practice," says the Supreme Court, "for courts to caution juries against too much reliance upon the testimony of accomplices, and to require corroborating testimony before giving credence to them." Holmgren v. United States, 217 U. S. 509, 523, 524, 30 Sup. Ct. 588, 592 (54 L. Ed. 861, 19 Ann. Cas. 778). And the conclusion is that the uncorroborated testimony of the confessed perpetrator of a crime, contradicted under oath by herself, contradicted by other witnesses, and inspired by the hope of immunity from punishment, which in this case has since turned to glad fruition, that another was an instigator or a participator in the perpetration of her crime, is not only insufficient to establish his guilt beyond a reasonable doubt, but that it presents no substantial evidence of it. Jahnke v. State, 68 Neb. 154, 104 N. W. 154, 158.

[2-4] To escape from the effect of this conclusion, counsel challenge our attention to the fact that no request for a peremptory instruction to return a verdict for Sykes was made at the trial, and invoke the conceded rule that the court may not review the existence of evidence to sustain a verdict, in the absence of a request after the close of the evidence for a peremptory instruction. Rimmerman v. United States, 186 Fed. 307, 311, 108 C. C. A. 385. But there is an exception to this general rule which has been made to prevent just such gross injustice as would result from the punishment of the defendant Sykes upon the evidence which has been recited. It is that in criminal cases, where the life, or as in this case the liberty, of the defendant is at stake, the courts of the United States, in the exercise

of a sound discretion, may notice such a grave error as his conviction without evidence to support it, although the question it presents was not properly raised in the trial court by request, objection, exception, or assignment of error. Wiborg v. United States, 163 U. S. 632, 658, 16 Sup. Ct. 1127, 1197, 41 L. Ed. 289; Clyatt v. United States, 197 U. S. 207, 221, 25 Sup. Ct. 429, 49 L. Ed. 726; Crawford v. United States, 212 U. S. 183, 194, 29 Sup. Ct. 260, 53 L. Ed. 465, 15 Ann. Cas. 392; Weems v. United States, 217 U. S. 349, 362, 30 Sup. Ct. 544, 54 L. Ed. 793, 19 Ann. Cas. 705; Williams v. United States, 158 Fed. 30, 36, 88 C. C. A. 296, 302; Humes v. United States, 182 Fed. 485, 486, 105 C. C. A. 158, 159; Pettine v. New Mexico (C. C. A.) 201 Fed. 489.

The defendant in this case may not be lawfully deprived of his liberty for five years without proof of his guilt beyond a reasonable doubt much less without any substantial evidence of it, and this court cannot disregard his appeal, sit in silence, and permit the perpetration of such an injustice.

The judgment below is accordingly reversed, and the case is remanded to the District Court for a new trial.