**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Lawrence P. BARDIN, Defendant-Appellant.**

**No. 10953.**

United States Court of Appeals
Seventh Circuit.

June 3, 1955.

Rehearing Denied July 1, 1955.

Finnegan, Circuit Judge, dissented.

Prentice H. Marshall, Chicago, Ill., for appellant.

H. Brian Holland, Asst. Atty. Gen., Fred G. Folsom, Atty., Washington, D. C., Jack C. Brown, U. S. Atty., Indianapolis, Ind., Ellis N. Slack, David L. Luce, David R. Urdan, Sp. Assts. to Atty. Gen., for appellee.

Before FINNEGAN, SWAIM and SCHNACKENBERG, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

We have awaited the decisions of the United States Supreme Court in Holland v. United States [1] and other "net worth" tax cases. Our consideration of the principles of law there formulated which we deem applicable to this case, followed by a divergence of views among the members of this court, has delayed the decision. The writing of an opinion was assigned to the author on April 14, 1955.

This is an appeal from a judgment of the district court, entered on the verdict of a jury finding defendant guilty, as charged in a two-count indictment, of willfully and knowingly attempting to defeat and evade a large part of the income tax due and owing by him to the United States of America for the calendar year 1946.

Count I charged that on or about May 26, 1947, defendant did willfully and knowingly attempt to defeat and evade said tax by filing a false and fraudulent income tax return for the calendar year 1946, wherein he stated his net income for said year was $528,824.56 and the tax due and owing thereon was $426,382.89, whereas, as he then and there well knew, his net income for said year was $759,-827.94, more or less, and the tax due thereon was $639,841.28, more or less. Count II charged that "on or about September 15, 1946, through and including May 27, 1947", the defendant did willfully and knowingly attempt to defeat the payment of said tax due and owing by him "by concealing and attempting to conceal from the Collector of Internal Revenue the nature and extent of his assets and the location thereof, said tax being $639,841.28, more or less, by refusing to pay said tax due and owing, and at said times he having funds with which to pay said tax." Both counts are based on 26 U.S.C.A. § 145(b). Defendant urges as grounds for reversal: (1) the trial court's refusal to grant defendant's motion for acquittal, (2) the alleged misconduct of the United States attorney during the course of the trial, and the trial court's alleged failure to take proper and necessary steps to prevent the said misconduct from influencing the jury in its deliberations, and (3) count II actually charged defendant with a misdemeanor, rather than a felony, and was therefore barred by the statute of limitations.

[1]. 1954, 348 U.S. 121, 75 S.Ct. 127.

**1.** Whether the trial court erred in refusing to grant defendant's motion for acquittal, requires us to determine whether the substantial evidence, taken in a light most favorable to the prosecution, tends to show the defendant is guilty beyond a reasonable doubt. United States v. Yeoman-Henderson, Inc., 7 Cir., 193 F.2d 867, at page 869. The facts thus proved by such evidence, much of it undisputed, are as follows:

This case involves defendant's income for the calendar year 1946.

On December 6, 1945 defendant closed a deal for the purchase of a brewery, and embarked upon the business of selling beer at prices above the ceiling prices fixed by federal price control regulations. Specific payments to him for this purpose during the taxable year 1946 totaled $242,492.00. He failed to keep adequate financial records. He also carried on extensive tradings in grains through brokerage houses.

Defendant put $250,000 in a safe in his brother's home in California. According to defendant, $175,000 was secreted there in 1946, and the balance of $75,000 in early January, 1947. The jury could reasonably infer that this $75,000 was a part of defendant's income for 1946, rather than that it constituted income for the period from January 1, 1947 to January 15, 1947, when it was deposited in the safe in California.

On January 1, 1946 defendant's net worth was $51,297.85, and on December 31, 1946, it was $799,610.67. Thus, the difference between the amounts on the first and last days of 1946, or the net worth increase for 1946, was $748,312.82. The addition of non-deductible expenditures for 1946 increased the latter figure to $758,713.94. This was defendant's net income for 1946 computed according to the net worth theory formula. Holland v. United States, 348 U.S. 121, at page 125, 75 S.Ct. 127. The net income reported by defendant on his return for that year is $528,824.56. He filed no returns prior to 1942. According to income tax returns filed with the Internal Revenue Collector, the defendant and his wife had a total income of $3,861.15 and net income of $2,311.15 for the year 1942. For 1943 they had a total income of $12,067.25 and net income of $1,602.25. For the next two years, defendant alone reported as follows:

| Year | Gross Income | Net income |
|------|-------------|------------|
| 1944 | $8,314.85 | None |
| 1945 | 8,196.15 | $3,873.30 |

These figures tend to show that defendant's income during prior years was insufficient to have enabled him to save any appreciable amount of money, and thus tend to corroborate the relatively low figure set by the government as defendant's beginning net worth. Holland v. United States, supra, 348 U.S. at page 133, 75 S.Ct. 127.[2] Defendant failed to file an estimated return for 1946 and delayed filing an actual return until May 27, 1947.

On June 13, 1947, defendant talked to the assistant collector of internal revenue. He claimed inability to pay the tax in the amount shown by his return. He failed to mention $25,000 which was later found in cash in a safe deposit box and turned over to the government on a court order and about $20,000 due him on an account with his stock broker. A day or two prior to June 19, 1947, defendant withdrew the latter amount from the stock broker. He also failed to mention $46,939.94 which was in one of his bank accounts known as "L. P. Bardin for account of Alvin Bardin." All this was in addition to the sum of $250,000 withdrawn from Indianapolis banks during 1946 and taken by defendant personally to California and hidden in the safe hereinabove referred to. Although defendant,

---

**2.** The evidence also shows an alternative calculation based upon United States v. Johnson, 319 U.S. 503, at page 517, 63 S.Ct. 1233, 87 L.Ed. 1546. Defendant's total expenditures for 1946 amounted to $831,441.15, as against his reported income of $521,883.63. That he had large, unreported income, was reinforced by this proof.

when pressed by the government to file a 1946 income tax return, reported, on May 26, 1947, that this money was stolen from the safe during a burglary the day before, and the physical circumstances surrounding the safe at least simulated a burglary, none of the money was ever recovered, and no one connected with the commission of the alleged crime was ever apprehended.

■ From the foregoing facts the jury was justified in finding that defendant was proved guilty as to count I beyond a reasonable doubt, though not to a mathematical certainty. No more was required. Holland v. United States, supra, 348 U.S. at page 138, 75 S.Ct. 127.

The conduct of the defendant in connection with his belated filing of his 1946 tax return, and his misrepresentations as to his inability to pay any part of his tax, support the verdict of the jury as to count II.

The trial court did not err in denying defendant's motion for acquittal.

■ 2. Alvin Bardin, brother of defendant, was called as a government witness. He declined to answer certain questions on the ground that to do so might incriminate him. The court sustained the position of the witness and he was excused. Upon his departure from the stand no admonition was given by the court to the jury that they should draw no inferences unfavorable to the defendant from the witness' refusal to testify.

In his closing statement, the district attorney referred to the fact that Alvin Bardin had exercised his privilege of refusing to testify, and asked the jury why he did that. At this point defense counsel objected, and that objection was sustained by the court. Thereupon the district attorney asked the jury to disregard any reference he had made to the failure of the witness to testify. Defense counsel made no motion in reference to the incident and did not ask the court to admonish the jury in reference to the matter. Defendant cannot now in this court be permitted to capitalize on his counsel's failure to press for further action by the trial court. Moreover, the court's sustaining of the objection clearly indicated to the jury that the remark of government counsel was improper.

We do not believe that these incidents deprived defendant of a fair trial, or that the action of the court in connection with them was erroneous.

A dissenting opinion by our colleague speaks of the failure of the district court to give to the jury such an instruction on the net worth theory as is referred to in Holland v. United States, supra.

■ On the trial there was no instruction tendered by defendant which was refused by the court. In this court his counsel has not assigned error on the subject of instructions. He was represented in the trial court by a member of the bar of this court, whose competency has not been questioned herein. In this court, his present counsel has filed a brief and made an oral argument which attests not only to his competency, but also to the diligent effort which he made to properly present all questions deemed to be available on this appeal. Present counsel has not argued or briefed any point on the instructions.[3]

3. In view of this record, the matter of an instruction on the net worth theory is undoubtedly irrelevant. However, we note that in Holland v. United States, 348 U.S. 121, at page 129, 75 S.Ct. 127 (which decision was announced after the trial and the arguments before this court in the case at bar), it was pointed out that charges to a jury in such a case should be especially clear, including, in addition to the formal instructions, a summary of the nature of the net worth method, the assumptions on which it rests, and the inferences available both for and against the accused.

In the case at bar, in reference to the net worth theory, the court instructed the jury:

"In determining whether defendant Bardin received a net income in excess of that reported in his income tax return for the year 1946, you may consider the facts and circumstances in evidence and view them in relation to each other. In this connection, you may compare the defendant Bardin's net worth

3. Defendant contends that his prosecution under count II was barred by the three-year statute of limitations,[4] because that count charged a misdemeanor under section 145(a),[5] not a felony under section 145(b).[6] He relies on Spies v. United States, 317 U.S. 492, 63 S.Ct. 364, 87 L.Ed. 418.

The material allegations of count II are:

"That on or about September 15, 1946, through and including May 26, 1947, in the Indianapolis Division of the Southern District of Indiana, Lawrence P. Bardin did willfully and knowingly attempt to defeat the payment of the income tax due and owing by him to the United States of America for the calendar year 1946 by concealing and attempting to conceal from the Collector of Internal Revenue the nature and extent of his assets and the location thereof, said tax being $639,841.28, more or less, by refusing to pay said tax due and owing, and at said times he having funds with which to pay said tax,

all in violation of Title 26, U.S.C., Section 145(b)."

Defendant says that the crux of the matter was defendant's refusal to pay his tax obligation, i. e., his willful failure to pay said tax. The pertinent parts of § 145(a) provide:

"Any person required under this chapter to pay any estimated tax or tax * * * who willfully fails to pay such estimated tax or tax * * * shall * * * be guilty of a misdemeanor and, upon conviction thereof, be fined not more than $10,000, or imprisoned for not more than one year, or both, * * *."

and of § 145(b) provide:

" * * * any person who willfully attempts in any manner to evade or defeat any tax imposed by this chapter or the payment thereof, shall * * * be guilty of a felony and, upon conviction thereof, be fined not more than $10,000, or imprisoned for not more than five years, or both * * *."

of assets at the beginning of the taxable period in question and his net worth of assets over income reported at the end of that period. You may also consider any expenditures of the defendant Bardin, as well as any property acquired by him during the period involved, as shown by the evidence."

The instruction on the same subject given in the Holland case, which has been made available to this court by the clerk of the United States Supreme Court, reads:

"Now, Ladies and Gentlemen of the Jury, the Government has produced evidence here that on January 1, 1946, Mr. and Mrs. Holland had certain property, of a value with respect to which the Government has presented evidence. And the Government says that at that time they had a net worth of some nineteen thousand dollars. The Government says that three years later—this is their claim, you know—the Government says that at the end of 1946 their net worth was increased, and again at the end of 1947 that their net worth was further increased, and again at the end of 1948 their net worth was again increased. And the Government says it is reasona-

ble to infer that the increase in the property that they owned, and in the value of it, is attributable and were the result of purchases from receipts earned in the taxable years in question from that business."

Neither of these instructions tells the jury of the pitfalls inherent in the net worth method, yet, while defense counsel in the Holland case specifically objected to the instruction given, on the ground that it did not fully explain the net worth theory, the objection was overruled and his two tendered instructions explaining the theory in more detail, were refused. Yet the court affirmed the conviction.

It seems clear that the language of the Holland opinion will be a guide for future trials based on the net worth theory, but it does not indicate that, in cases previously tried, the failure to give a net worth instruction other than that given in the Holland case and in the case at bar, requires reversal.

4. 26 U.S.C.A. § 3748(a).

5. 26 U.S.C.A. § 145(a).

6. 26 U.S.C.A. § 145(b).

■■ A failure to pay a tax, under § 145(a), and an attempt to defeat and evade one, under § 145(b), must both be willful. However, the difference between the two offenses is found in the affirmative action implied from the term "attempt" as used in § 145(b), the felony sub-section. As the court said in Spies v. United States, supra, 317 U.S. at page 499, 63 S.Ct. at page 368:

> "Willful but passive neglect of the statutory duty may constitute the lesser offense, but to combine with it a willful and positive attempt to evade tax in any manner or to defeat it by any means lifts the offense to the degree of felony."

Accordingly, in count II, a willful and knowing attempt is charged in the affirmative action taken by the defendant to accomplish his purpose, i. e., "by concealing and attempting to conceal from the collector of internal revenue, the nature and extent of his assets and the location thereof." Indeed, the court in Spies v. United States, supra, 317 U.S. at page 499, 63 S.Ct. at page 368, in illustrating what conduct would justify a basis for "affirmative willful attempt", listed, among others, "concealment of assets or covering up sources of income". In view of the fact that defendant was engaged in transactions which exposed him to prosecution under the federal price regulations, the following statement of the court in Spies v. United States, supra, also 317 U.S. at page 499, 63 S.Ct. at page 368, is pertinent here:

> "If the tax-evasion motive plays any part in such conduct the offense may be made out even though the conduct may also serve other purposes such as concealment of other crime."

We hold that count II charges a felony under § 145(b). Mr. Prentice H. Marshall, a member of the bar of this court, served in this court as appointed counsel for the defendant. We express our appreciation of his diligent performance of his duties.

For the reasons herein set forth, we affirm the judgment of the district court.

FINNEGAN, Circuit Judge (dissenting).

Judicial bouquets handed appellate-defense counsel for earned competency, are small simple solace to this defendant, now confronted with prison. Indeed, I cannot, as easily as the majority does, approve deprivation of liberty, nor countenance such facile stigmatizing with a criminal conviction. I also entertain grave doubts that the Government's fiscal affairs are in so delicate balance that a new trial would jeopardize that financial equilibrium. My concern, here, is whether there are present "plain errors or defects affecting substantial rights" which "may be noticed although they were not brought to the attention of the court." Rule 52(b), Fed.R.Crim.Proc. 18 U.S. C.A. I think Rule 52(b) supersedes Rule 30, Fed.R.Crim.Proc., 18 U.S.C.A. in appropriate cases. This appeal brings into sharp relief some of the ideas captured by Mr. Justice Frankfurter in a passage from Bollenbach v. United States, 1946, 326 U.S. 607, 615, 66 S.Ct. 402, 406, 90 L.Ed. 350, where, speaking for the majority he said:

> "From presuming too often all errors to be 'prejudicial,' the judicial pendulum need not swing to presuming all errors to be 'harmless' if only the appellate court is left without doubt that one who claims its corrective process *is, after all, guilty.* In view of the place of importance that trial by jury has in our Bill of Rights, it is *not to be supposed that Congress intended to substitute the belief of appellate judges in the guilt of an accused,* however justifiably engendered by the dead record, for ascertainment of guilt by a jury under appropriate judicial guidance, however cumbersome that process may be." (Italics added.)

Previously our court paid homage to those principles [United States v. Levi, 7 Cir., 1949, 177 F.2d 833, 835, United

States v. Raub, 7 Cir., 1949, 177 F.2d 312, 315, United States v. Haupt, 7 Cir., 1943, 136 F.2d 661] and now I perceive no justifiable reason for being deflected from them. "Strictly speaking," said Mr. Justice Harlan, when delivering the majority opinion reported as Davis v. United States, 1895, 160 U.S. 469, 487–488, 16 S. Ct. 353, 358, 40 L.Ed. 499, "the burden of proof, as those words are understood in criminal law, is never upon the accused to establish his innocence, or to disprove the facts necessary to establish the crime for which he is indicted. It is on the prosecution from the beginning to the end of the trial, and applies to every element necessary to constitute the crime." Having awaited, as my brothers particularly note, that quartet of decisions lead by Holland v. United States, 1954, 348 U.S. 121, 138, 75 S.Ct. 127, 137, it is well to recall this apt statement from that opinion:

> " * * * The Government must still prove every element of the offense beyond a reasonable doubt though not to a mathematical certainty. The settled standards of the criminal law are applicable to net worth cases just as to prosecutions for other crimes. * * * "

A judicial poultice applied at our reviewing level may palliate the sting of error committed below, but such treatment falls far short of an actual cure attainable only by ordering a new trial. Bihn v. United States, 1946, 328 U.S. 633, 66 S.Ct. 1172, 90 L.Ed. 1485.

Wiborg v. United States, 1896, 163 U.S. 632, 658, 16 S.Ct. 1127, 1137, 41 L. Ed. 289, a precursor to current Rule 52, contains Chief Justice Fuller's trenchant observation concerning a certain question not properly raised and about which he wrote: " * * * yet if a plain error was committed in a matter so absolutely vital to defendants, we feel ourselves at liberty to correct it." That Rule 52(b) Fed.R.Crim.Proc., 18 U.S.C.A. is a restatement of existing law, see 6 Institute Proceedings, N.Y.Univ.Sch. of Law, 88 (Fed.R.Crim.Proc. with Notes, 1946).

See also: Barron, Federal Practice and Procedure, Rules Edit., § 2587 (1951).

I refuse to affirm Bardin's conviction because, upon mature consideration of this record, I think it embodies several plain errors and defects affecting substantial rights belonging to defendant. Therefore, I cannot placidly cite United States v. Yeoman-Henderson, Inc., 7 Cir., 1952, 193 F.2d 867 and simply state the trial court acted correctly in denying defendant's motion for judgment of acquittal. Because even if the defendant appears to be a bad man in light of the prosecution's portrayal, he is still entitled to a fair and impartial trial free from plain errors and defects mentioned in Rule 52(b). See my recent dissenting opinion in United States v. Vasen, 7 Cir., 222 F.2d 3. The converse of this proposition is virtually the inarticulated major premise underlying affirmance of Bardin's conviction. Turning now to the two major areas of error for which I would reverse, they can be grouped as follows: (1) insufficient jury instructions and, (2) prejudicial conduct of the prosecuting attorney.

Merely recording recognition, without more, of the familiar and well settled postulate pervading all criminal prosecutions, i. e., the persuasion must be beyond a reasonable doubt, is insufficient in this appeal. Yet, I am also aware: "the truth is that no one has yet invented or discovered a mode of measurement for the intensity of human belief. Hence there can be yet no successful method of communicating intelligibly to a jury a sound method of self-analysis for one's belief." 9 Wigmore, Evidence, § 2497 (3rd ed. 1940). Despite Dean Wigmore's report of judicial struggles to articulate the definitive characteristics of "beyond a reasonable doubt" that phase remains the bench-mark in criminal cases. In Bardin's case the character of evidence spun on looms of computations powered by the net worth theory would have considerable impact on the minds of his jurors.

Since there is a grave possibility that jurors' reaction to *reasonable doubt* will

vary with instructions given them on various aspects of the case there is an acute need for careful judicial guidance in cases of this sort. When instructions are insufficient in this, or any, net-worth-expenditure case undue strength is lent the prosecution's theory. I think this defendant has the right to have a jury weigh the *nature* of proof offered against him. The difference between theorizing and suspicioning, in these cases, is that in the former formidable working papers and a maze of figures casts an aurora of reliability around the government's accountants. Indeed, the Holland majority's admonition, 348 U.S. 121, 129, 75 S. Ct. 127, 132, should be pointed up, because at the trial level, in Bardin's case, the Government erected its case against him by coupling the *expenditures theory* with the *net worth theory:*

"Appellate courts should review the cases bearing constantly in mind the difficulties that arise when circumstantial evidence as to guilt is the chief weapon of a method that is itself only an approximation."

In this case for the tax year 1946 the government has reconstructed what it contends was income flowing into Bardin's hands during that period. It has attempted to form a bridge between the opening and closing of that taxable year by detailing intermediate changes through a summation of transactions. This merely means that a hypothesis is sponsored concerning Bardin's taxable income for 1946, and various changes are analyzed. But these computations involve drawing of inferences by the government's witnesses which are, in turn, passed on to the jury for further extraction of inferences. I am well aware of the difficulties implicit in prosecuting persons accused of violating § 145, but I do think when such estimates are submitted to a jury the fact-finders ought to be told about the method. My cautionary mood, here, is fairly well described by that which Mr. Justice Clark reports as the stimulus for taking and reviewing Holland v. United States, 1954, 348 U.S. 121, 124–125, 75 S.Ct. 127, 130:

"In recent years * * * tax evasion convictions obtained under the net worth theory have come here with increasing frequency and left impressions beyond those of the previously unrelated petitions. We concluded that the method involved something *more than the ordinary use of circumstantial evidence* in the usual criminal case. Its bearing, therefore, on the safeguards traditionally provided in the administration of criminal justice called for a consideration of the entire theory. * * * " (Italics supplied.)

To appreciate the impact upon the jury of the net-worth theory—and it is simply a theory, it becomes necessary to examine that technique under one phase of the statutory setting for violation of which this defendant was prosecuted. Section 145(b) of the Revenue Act of 1939, 26 U.S.C. § 145(b) (1953), 53 Stat. 62–63 (1939) does not contain the words "fraud" or "criminal fraud." Bardin is prosecuted under that section for non-disclosure of alleged income, and the conduct with which he is charged must be willful. United States v. Murdock, 1933, 290 U.S. 389, 394–396, 54 S.Ct. 223, 78 L.Ed. 381. Spies v. United States, 1942, 317 U.S. 492, 499, 63 S.Ct. 364, contains some faint adumbration of criteria indicative of conduct proscribed by the words, " * * * any person who willfully attempts *in any manner* to evade or defeat any tax * * *," appearing in § 145(b). From Spies v. United States, 1942, 317 U.S. 492, 63 S.Ct. 364, 367, comes this explanation of the dichotomy embraced by § 145: (i) "Willful failure to pay the tax when due is punishable as a misdemeanor" § 145(a) and, (ii) the serious and inclusive felony defined to consist of willful attempt in any manner to evade or defeat the tax. § 145(b)." Of course the language of § 145(b) outlawing attempts to evade taxes "in any manner" is sweeping enough to make it a felony to willfully omit income from a tax return which has been filed. United States v. Beacon Brass Co., 1952, 344 U.S. 43. The problem lies in proof of

such an act by application of the indirect methods of computing income, *i. e.*, net-worth expenditure theory.

When reversing a conviction, under § 145(b), bottomed on the "expenditure" method, reported as United States v. Caserta, 3 Cir., 1952, 199 F.2d 905, 906, Judge Goodrich summarized the so-called net-worth theory as follows:

"This theory is in effect that if a taxpayer's net worth has increased during a given period in an amount greater than his reported income for that period, there must be a discrepancy in his income tax return and payment.

"An outgrowth of this net worth method is the 'expenditure' test * * *."

A letter, dated May 26, 1947, written by Bardin and transmitted to the Collector of Internal Revenue with his income tax return for 1946, supplies the first and dominant strand in the texture of this case. After apologizing for tardily filing his return after the expiration of an extension of time previously granted, defendant stated:

"However, I will be unable to pay this tax or any part of it for an indefinite time to come. I had $250,000.00 in cash in a safe in my brother's home in Los Angeles, California, until yesterday when the safe was burglarized and the money was stolen. This is a very heavy loss as you will realize and unless the money can be recovered, it is going to be very difficult for me to pay anything. The theft has been reported to the F.B.I. and to the police at Los Angeles."

After Government witness, W. Plummer, assistant director of the Bureau of Internal Revenue, identified the foregoing letter, it was received in evidence without objection. As the result of Plummer's conferences with Bardin during June, 1947, defendant submitted the following "Verified Statement of Assets and Liabilities" to the government, and it was subsequently introduced into the record below:

### Assets.

| | |
|---|---:|
| Cash on hand ............$ | 110.00 |
| Amount stolen from safe in home of Archie Bardin in Los Angeles, California .. | 250,000.00 |
| Airplanes ................ | None |
| Automobiles ............. | None |
| Real Estate ............. | None |
| Personal effects, clothing, wrist watch ............ | 250.00 |
| Loaned to W. G. Brower of Indianapolis, Indiana the sum of $55,000 evidenced by the promissory note of the said Brower in the principal sum of $55,000 and which note is secured by 800 shares of the preferred stock and by 24,000 shares of the common stock of Cold Springs Brewing Co., Lawrence, Massachusetts; also secured by 3000 shares of common stock in The Walnut Corporation, Boston, Mass., contingent value .. | 55,000.00 |
| Creditors claims against Cold Springs Brewing Co. purchased by Lawrence P. Bardin for which he paid the sum of $8,500, the claims amounting to $16,124, present estimated value ................. | 4,000.00 |
| Account with Thomson & McKinnon of Indianapolis, Indiana .............. | 450.00 |
| Total Assets .......$ | 309,810.00 |

### Liabilities.

| | |
|---|---:|
| Income Tax, Collector of Internal Revenue, as shown by return of Lawrence P. Bardin ................$ | 481,000.00 |

(This does not include interest or penalty. Furthermore, taxpayer expects to file an amended return which will show a tax liability of less than $481,000, the exact amount of which has not as yet been determined.)

Claim in suit of County Distributors, Inc. v. Lawrence P. Bardin in the Suffolk Superior Court, Cause No. 413429, Boston, Massachusetts, cause pending, no legal liability, cost of defense, contingent liability .................... 1,000.00

Claim in suit of U. S. v. Lawrence P. Bardin, et al., Cause No. Criminal 8711 in the U. S. District Court in Indianapolis, Indiana, no personal liability on the part of Lawrence P. Bardin ........ 0

O.P.A. suit in the U. S. District Court at Indianapolis, Indiana, against Lawrence P. Bardin ........ Cause No. Civil 1376, compromise contingent liability .................... 50,000.00

Total Liabilities ...$532,000.00"

Portions of certain witnesses' testimony may well be injected at this juncture on matters supplied by defendant. Archie Bardin, brother of the defendant, testified that while living in California during 1946 and 1947, taxpayer had a safe "put in" the witness's home. He described, as part of his testimony given for the government, this safe as being a little round floor one which was in the corner of a closet. Archie Bardin denied having access to the safe. He also recounted a chaotic scene, he found one day in May, 1947, upon returning home from a visit to the beach with his wife and children. It was, then, Archie Bardin found this safe "burned open." This witness disclaimed any knowledge of the safe's contents prior to the episode. He notified the Los Angeles Police Department and his brother, the defendant, who arrived in Los Angeles "the next day or a day later."

Confirmation of the household disarray, discovered by Archie Bardin, came from Sergeant R. S. Ruble, safe burglary detail, Los Angeles Police Department. His investigation, related as a government witness, disclosed that Archie Bardin's house had been entered by cutting a window screen. He found their house completely disarranged and the cylinder type Keyway floor safe burned open by use of an acetylene torch. In the bottom of this safe he found small minute papers and one envelope—on which was partially legible, "The Property of L. L.," and under "L", "Indianapolis Brewing Company, Indianapolis," and "small pieces of money, just the edges of money that you could tell it was currency." In the evening of the day he commenced his investigation, Sergeant Ruble's partner talked with Lawrence Bardin over the telephone. Without objection from counsel, Ruble related his partner's conversation with defendant Bardin in which Bardin said he placed $250,000 in the safe; his first deposit of $100,000 being made on December 5, 1946 after drawing this sum from an Indiana bank and flying, in his private plane, to California; that sometime after Christmas and before New Year's (in the year of 1947) defendant said he had placed $75,000.00 in this safe, and on January 15th or 20th he put another $75,000 in the safe—half of this sum coming from the Indiana National Bank; the balance from the Fidelity Trust Company Bank. Defendant was said to have stated he personally made these deposits; that no one save Lawrence Bardin had keys to the safe "and no one had permission to enter and no one knew the amount of money in the safe." Sergeant Ruble expressed a deprecatory opinion of the safe. While no recovery of the money had been made, Ruble stated: "We think we have a good lead on where part of the money is located at the present time. It was burned and scorched and unable to be patched. We have several good suspects in the case. We were able to go so far as to establish who our suspects were and we can put them in Los Angeles at a certain hotel a few hours prior to the burglary. We can identify the box that otherwise was being carried into the house, which ties it up in our own mind pretty well."

Momentarily putting to one side that evidentiary segment, brings me to several theories on which the government tried this case below. During the calendar year of 1946 the prosecution contends:

(a) Lawrence Bardin sold beer at over-ceiling prices and received, according to the proof below, $224,122 in payments.

(b) He spent approximately $856,891.15.

(c) Yet, reported taxable income of $528,824.56 for 1946.

(d) During 1946 his net worth increased $748,312.82.

Of course this is a capsuled version of the prosecution's case against defendant Bardin. But it penetrates to the core of the evidence. In other words the magnitude of Bardin's expenditures, it is contended, manifest presence of unreported taxable income for 1946, net worth methodology supplies the hypothesis for establishing and accounting for variations in his assets, and testimonial evidence tabulated some receipts and disbursements.

After his motion for judgment of acquittal was denied, defendant introduced several pieces of documentary evidence concerning litigation involving himself, Alvin Bardin, Indianapolis Brewing Company, Denmark Brewing Company, Eulberg Brewing Company and the Government. By introducing evidence after the government rested, and subsequent to his motion, defendant has precluded us from reviewing that first motion. United States v. Aman, 7 Cir., 1954, 210 F.2d 344, 346. By his second motion for judgment of acquittal interposed at the close of all the evidence, defendant has raised several major points for determination. Briefly, he urges that the evidence is insufficient to sustain a conviction under either Count I or II, and "that there is no proof of the corpus delicti independently of extra judicial admissions of the defendant"; "The net worth-expenditure method of establishing net income, being based upon circumstantial evidence, cannot be applied in this cause because the evidence fails to establish with certainty or accurately the net worth of the defendant at the beginning of the tax year in question and therefore is uncertain and does not form a proper basis upon which to apply and determine the net worth at the end of the period in question." And that " * * * the evidence introduced by plaintiff establishes the fact that the defendant in his income tax return in question actually overstated his net taxable income."

Parenthetically I note defendant's "standing objection," reflected in this record, to various lines of direct examination and evidence of defendant's admissions and statements. I also recognize that at least at one interview with Internal Revenue agent Loyd, the defendant was accompanied by his two lawyers. At this conference Bardin discussed certain phases of his income tax liability for 1946.

*Corpus delicti* is a phrase that has suffered treatment as an intellectual shuttlecock in many judicial opinions. I think the following an authoritative explanation of its definitive characteristics:

"It is clear that an analysis of every crime, with reference to this element of it, reveals three component parts, *first*, the *occurrence* of the specific kind of injury or loss (as, in homicide, a person deceased * * *); *secondly*, somebody's criminality (in contrast, e. g. to accident) as the source of the loss,— these two together involving the commission of a crime by *somebody;* and, *thirdly*, the accused's *identity* as the doer of this crime.

"(1) Now, the term 'corpus delicti' seems in its orthodox sense to signify merely the first of these elements, namely, the *fact of the specific loss or injury sustained; * *.* This, too, is a 'a priori' the more natural meaning; for the contrast between the first and the other elements is what is emphasized by the rule; *i. e.* it warns us to be cautious in convicting, since it may sub-

sequently appear that no one has sustained any loss at all; * * *.

"(2) But by most judges the term is made to include the second element also, *i. e. somebody's criminality* * * *.

"This broader form makes the rule much more difficult for the jury to apply amid a complex mass of evidence, and tends to reduce the rule to a juggling-formula.

"(3) A third view, indeed, too absurd to be argued with, has occasionally been advanced, at least by counsel, namely, that the 'corpus delicti' includes the third element also, *i. e. the accused's identity* or agency as the criminal. By this view, the term 'corpus delicti' would be synonymous with the whole of the charge, and the rule would require that the whole be evidenced in all three elements independently of the confession, which would be absurd * *."
VII Wigmore, *Evidence,* § 2072 (3rd ed. 1940).

Recently, another "net worth case," Smith v. United States, 1954, 348 U.S. 147, 154–155, 75 S.Ct. 194, 198, precipitated some pronouncements relevant here:

"* * * But in a crime such as tax evasion there is no tangible injury which can be isolated as a *corpus delicti.* As to this crime, it cannot be shown that the crime has been committed without identifying the accused. Thus we are faced with the choice either of applying the corroboration rule to this offense and according the accused even greater protection than the rule affords to a defendant in a homicide prosecution * * * (citing) or of finding the rule wholly inapplicable because of the nature of the offense, stripping the accused of this guarantee altogether. We choose to apply the rule, with its broader guarantee, to crimes in which there is no tangible *corpus delicti,* where the corroborative evidence must implicate the ac-

cused in order to show that a crime has been committed. * * *

" * * * There is some uncertainty in the lower court opinions as to whether the corroboration requirement applies to mere admissions * * *. We hold the rule applicable to such statements, at least where, as in this case, the admission is made after the fact to an official charged with investigating the possibility of wrong doing, and the statement embraces an element vital to the Government's case. * * *"

I confine my dissent to certain factual aspects demonstrative of the need for suitable instructions consonant with precepts announced in Holland v. United States, 348 U.S. 121, 75 S.Ct. 127.

So much, then, of the facts, relevant to this opinion follow. Defendants' federal income tax returns for the calendar years 1942 to 1946 were introduced in evidence. Neither Lawrence Bardin, nor his wife, filed any such returns prior to 1942. He reported net income of $2,311.-15 for 1942, $1,717.25 in 1943, $8,114.85 in 1944, and $2,873.30 in 1945.

Attached to his 1945 return is a statement scheduling various capital transactions, including the sale of grain futures during the last three days of 1945. Bardin stated his occupation, variously, as manufacturer, broker, salesman and executive in different returns. No 1946 estimated tax return was filed by him.

During 1945, Frank McHale was a principal stockholder in, and attorney for, the Indianapolis Brewing Company. From this witness' testimony, given in the government's behalf, it appears that Lawrence Bardin, and two attorneys, Klein and Jacobson, negotiated with McHale for the purchase of that Brewery, and as a result an agreement was prepared for stockholder approval. Jacobson represented Alvin Bardin. This sale, closed December 6, 1945, was for a total price of $476,662.16. Alvin Bardin, pursuant to contract terms, was to pay $215,-464.26 and on December 6, 1945, he paid $35,464.26. At a special board of di-

rectors' meeting held December 7, 1945, new directors succeeded the old, who resigned, and Alvin Bardin was named president. Thereupon, Indianapolis Brewing purchased from Alvin Bardin capital stock of Denmark and Eulberg Breweries, paying him for each block, respectively $98,200.00 and $81,100. Adding this payment, totaling $179,300 to the prior $35,464.26 payment equated to the agreed down payment of $215,464.-26. Six promissory notes were executed totaling $261,197.90, representing the unpaid balance on purchase price due to the Indianapolis Brewing Company stockholders.

Under its mortgage to the Fidelity Trust Company, Indianapolis Brewing Company borrowed $120,000.00 on December 14, 1945, using the Denmark and Eulberg stock as security. This same day Alvin Bardin paid $90,000.00 out of the borrowed funds, thereby reducing indebtedness to a former Indianapolis shareholder to $171,197.90. After May 27, 1946, this balance was paid in full.

Nine government witnesses testified, in substance, that during 1946, they paid overceiling prices to Lawrence Bardin for beer—the legal price being paid by sight draft invoice bill of lading to Indianapolis Brewing Company. This source, according to Special Agent Loyd, whose testimony we subsequently point up, produced $224,122. All government witnesses related their personal negotiations with defendant under which they were supplied with beer only upon paying money over the list price, at prices averaging from 10¢ to $1.60 per case. Some evidence presented by the prosecution indicated defendant sought out these persons when he, Lawrence Bardin, was attempting to finance the purchase of the Indianapolis and Denmark Breweries.

Special Agent Hugh S. Loyd, Bureau of Internal Revenue, was a pivotal government witness. On April 15, 1949 he interviewed the defendant and during this interview Lawrence Bardin stated *inter alia:* that he was uncertain as to what amount of money, if any, Alvin Bardin owed him at the end of 1944, 1945 and 1946; that he and Alvin had obtained advance deposits from prospective customers of the Denmark and Eulberg breweries, used in the acquisition of the stock of those companies; that he was uncertain as to the amount of cash he had on hand at the end of 1945 and 1946; that he initiated the negotiations leading to the acquisition of the Denmark and Indianapolis breweries; that some of his personal expenses were paid through the account entitled "L. P. Bardin for acct of Alvin Bardin"; that Alvin Bardin furnished the funds which were credited to that account; that Alvin Bardin furnished the funds with which he, defendant, paid the former shareholders of the Indianapolis Brewing Company; that he had invested approximately $150,000.00 in the Cold Spring Brewery in 1947; that he obtained the funds for this investment, as well as the amounts deposited with Thomson and McKinnon and the $250,000.00 cash stolen from the Los Angeles safe, by overceiling collections on the sales of beer by the Indianapolis Brewing Company.

Loyd further testified that the testimony and evidence showed:

(a) the defendant had received overceiling payments in the amount of $224,122.00;

(b) the defendant had invested $329,765.30 in cashier's checks during 1946 (this amount Loyd later raised to $451,437.32);

(c) as of the end of 1946 there were credits in defendant's account with Daniel F. Rice of $7,657.82, and with Thomson & McKinnon of $151,-546.42, with a resultant net credit after charges in both of $139,208.19;

(d) in 1947, the defendant had invested $150,000.00 in the Cold Springs Brewing Company;

(e) the defendant claimed a deduction of $5,339.84 for Indiana Gross Income Tax though he had paid $2.50;

(f) during 1946, the defendant made expenditures of:

(1) $7,657.82 deposited with Daniel F. Rice;

(2) $151,546.42 deposited with Thomson & McKinnon;

(3) $241,973.00 credited to the account "L. P. Bardin for the acct of Alvin Bardin";

(4) $171,197.90 payments to former shareholders;

(5) $4,813.20 payments on income tax;

(g) these expenditures totaled $692,887.17 from which Loyd eliminated certain itemized matters totaling $85,996.02, leaving net expenditures of $606,891.15 (502–504);

At this juncture defense counsel renewed a previous objection raised against Loyd's recapitulation of evidentiary data concerning net worth, but the trial judge stated "This is the summary breakdown." Loyd continued testifying to the effect he had added $250,000.00 as cash on hand, to the total net expenditures.

Loyd then identified cashier's checks which defendant had stated to Loyd he had purchased with funds from Alvin Bardin and used to pay the former shareholders of the Indianapolis Brewing Company, and they were admitted. On the basis of these exhibits Loyd raised the amount expended by defendant in 1946 for cashier's checks to $451,437.32.

This witness then reported his summation of what the evidence showed:

(h) on January 1, 1946, the credit balance of defendant's account with Daniel F. Rice was $15,413.59;

(i) on January 1, 1946, the credit balance of defendant's account with Gerstenberg Co. was $270.00;

(j) on December 31, 1946, defendant's Thomson & McKinnon account had a credit balance of $139,208.19; on January 15, 1947, it was $139,438.19; on March 31, 1947 it was $41,890.67; on May 27, 1947 it was $33,797.89;

(k) as of December 31, 1946, defendant had invested $23,000.00 in Central Air Parts, Inc., which remained the same through May 27, 1947;

(*l*) as of September 15, 1946, defendant had loaned Archie Bardin $10,000.00, which debt remained the same through May 27, 1947;

(m) the cost of the Indianapolis Brewing Company stock was $296,662.16 as of January 1, 1946 arrived at by deducting the $180,000 proceeds from the Eulberg and Denmark transaction from the contract price of $476,662.16 *but*, on December 31, 1946, and thereafter the cost basis of the stock was $476,662.16;

(n) as of December 31, 1946 the defendant had $250,000.00 cash on hand, as was so on March 31, 1947; by May 27, 1947 he had none;

(o) the account "L. P. Bardin for the acct of Alvin Bardin" had credit balances as follows:

| | | |
|---|---|---:|
| (1) | January 1, 1946 | $ 150.00 |
| (2) | September 15, 1946 | 52,523.02 |
| (3) | December 31, 1946 | 40.32 |
| (4) | January 15, 1947 | 4,835.47 |
| (5) | March 31, 1947 | 110,861.57 |
| (6) | May 27, 1947 | 143,519.44 |

(p) on December 31, 1946 "L. P. Bardin for the acct of Alvin Bardin" was debited $80,000.00 and "Accounts Payable—Due Others" was credited a like amount, which amount remained in the latter account through May 27, 1947;

(q) the "summary concerning the total of the testimony" he had just "recited" was:

| | | |
|---|---|---:|
| (1) | as of January 1, 1946 | $ 312,495.57 |
| (2) | as of September 15, 1946 | 608,269.95 |
| (3) | as of December 31, 1946 | 978,910.67 |
| (4) | as of January 15, 1947 | 983,935.82 |
| (5) | as of March 13, 1947 | 1,142,414.40 |
| (6) | as of May 27, 1947 | 916,979.39 |

(r) the account "Loans Officers" reflecting amounts due the Indianapolis Brewing Company, showed the following balances:

| | | |
|---|---|---:|
| (1) | as of January 1, 1946 | $ 90,000.00 |
| (2) | as of September 15, 1946 | 179,300.00 |
| (3) | as of December 31, 1946 | 179,300.00 |
| (4) | as of May 27, 1947 | 179,300.00 |

(s) as of January 1, 1946, $171,-197.90 was owed the former shareholders of the Indianapolis Brewing Company;

(t) "all of these liabilities" amounted to:

(1) as of January 1, 1946    $261,197.90
(2) as of December 1, 1946    179,300.00
(3) as of May 27, 1947    179,300.00

(u) the difference between assets and liabilities amounted to:

(1) as of January 1, 1946    $ 51,297.85
(2) as of September 15, 1946    428,969.95
(3) as of December 31, 1946    799,610.67
(4) as of May 27, 1947    737,679.39

(v) the difference between the assets minus liabilities as of January 1, 1946, and as of December 31, 1946, was $748,312.82;

(w) the defendant paid life insurance premiums of $3,334.20 during 1946 and suffered a non-deductible long term capital loss of $2,253.72, which when added to his income tax payment and the previous sum of $748,312.82 totaled $753,713.94;

(x) the defendant's 1946 income tax return showed a net income of $521,883.63.

Loyd revised his earlier statement as to the defendant's expenditures during the year 1946, eliminating therefrom another $25,450.00, leaving a "balance" of $831,441.15.

On cross-examination Loyd admitted that Alvin Bardin had reported the capital gain tax on gain realized from the sale of the Indianapolis Brewing Company stock to the several tavern owners. Although he (Loyd) knew the question of beneficial ownership of the Indianapolis stock was involved in this prosecution he had not investigated to determine who had received the final receivership dividend. He also testified that in his opinion the expenditures of the defendant represented taxable income, qualifying this however as based upon assumptions that (i) defendant had no prior accumulations, (ii) the account "L. P. Bardin for the acct of Alvin Bardin" belonged to defendant, and (iii) the money spent by defendant belonged to defendant. Furthermore, if there was any duplication, then the conclusion would be incorrect.

Loyd reduced the cost basis of the Indianapolis stock by $180,000.00 as of January 1, 1946, because the Eulberg and Denmark stock was returned to its prior owner in May, 1946. In his net worth computation, Loyd assumed that defendant owned the Indianapolis Brewing Company stock.

The government closed its case by recalling Earl P. Miller, an Internal Revenue Agent, and asking him the following hypothetical question:

"* * * assuming that the defendant in this case * * * had a net cash income for the taxable year, 1946, as shown by the income tax return for that year in the sum of $521,883.63, and assuming that he made expenditures in the amount of $831,441.15 in excess of his available declared resources, was taxable income received by the defendant during the year 1946, would there be a tax due and owing the United States by the defendant in excess of the amount of tax, if any, as shown on the defendant's income tax return for the year 1946?"

To this the defendant objected on the grounds that the "hypothesis" was not established by the evidence. The objection was overruled. Miller answered that upon a net income of $831,441.15 there would be a tax liability of $688,-295.38 and that defendant had paid $31,-757.55 on his 1946 income tax.

This record contains considerable evidence, but enough has been stated showing the complexity of the testimony and the resultant need for carefully guiding a jury. What is said in the Holland case, and which I quote further along in my opinion, becomes meaningful, here, only when related to the facts in Bardin's case. Having assembled some data embraced by this record, and about which defense and prosecution contest, I tabulated it as follows:

## ANALYSIS OF EVIDENCE AND CONTENTIONS CONCERNING NET WORTH

| ASSETS | Assets and Liabilities—January 1, 1946 | | | Assets-Liabilities, Dec. 31, 1946 | | | Increase In Net Worth | | Difference In Net Worth Increase |
|---|---|---|---|---|---|---|---|---|---|
| | Government | Defendant | Differences Plus or Minus | Government | Defendant | Differences Plus or Minus | Government | Defendant | |
| Cash on Hand ........... | | | | $250,000.00 | $ 100,000.00 | $(150,000.00)(b) | | | |
| Accounts Receivable: | | | | | | | | | |
| Archie Bardin ......... | | | | 10,000.00 | 10,000.00 | | | | |
| Accounts Payable Due Others—Indianapolis. Books | | | | 80,000.00 | 80,000.00 | | | | |
| Account Balances: | | | | | | | | | |
| "L. P. Bardin for Account Alvin Bardin" ... | $ 150.00 | $ 150.00 | | 40.32 | 40.32 | | | | |
| Gerstenberg Co. ....... | 270.00 | 270.00 | | -0- | -0- | | | | |
| Daniel Rice Co. ........ | 15,413.59 | 15,413.59 | | -0- | -0- | | | | |
| Thompson and McKinnon | | | | 139,208.19 | 139,208.19 | | | | |
| Grain Sales, Dec. 28-Dec. 31, 1945 ........... | $161,697.50 | $161,697.50 | $161,697.50 | -0- | -0- | -0- | | | |
| Stock: | | | | | | | | | |
| Indianapolis Brewing Co. (a) ........... | 296,662.16 | 476,662.16(a) | 180,000.00(a) | 476,662.16(a) | 476,662.16(a) | | | | |
| Eulberg & Denmark Breweries ........... | | | | | 180,000.00 | 180,000.00(a) | | | |
| Investment: | | | | | | | | | |
| Central Air Parts, Inc. .. | | | | 23,000.00 | 23,000.00 | | | | |
| Totals—Assets .......... | $312,495.75 | $654,193.25 | | $978,910.67 | $1,008,910.67 | | | | |
| Sum of Differences ....... | | | $341,697.50 | | | $ 30,000.00 | | | |
| LIABILITIES | | | | | | | | | |
| Total Liabilities ........ | 261,197.90 | 261,197.90 | | $179,300.00 | $ 179,300.00 | | | | |
| Final Net Worth: | | | | | | | | | |
| Based Upon Government Computations ......... | | | | $799,610.67 | | | $799,610.67 | | |
| Based Upon Defendant's Argument ........... | | | | | $ 829,610.67 | | | $829,610.67 | |

| | | | | |
|---|---|---|---|---|
| Opening Net Worth: | | | | |
| Per Government Computations ............. | $ 51,297.85 | | 51,297.85 | |
| Per Defendant's Contentions ............. | $ 51,297.85 | | | |
| Increase in Net Worth 1/1/46 to 12/31/46 .... | $392,995.35 | | 392,995.35 | |
| Net Differences in Computation of Assets— 1/1/46 to 12/31/46 .... | $341,697.50 | $748,312.82 | $436,615.32 | $311,697.50 |
| Income Reported on Line 6, Form 1040, for Calendar Year 1946 .......... | $ 30,000.00 | | | $311,697.50 |
| Difference Between Reported Income and Government Computation of Increase in Net Worth ... | | | 528,824.56 | |
| Count I, Indictment— Amount Charged as Bardin's Income for Calendar Year 1946 .......... | | | $219,488.26 | |
| Income Reported on Form 1040, for Calendar Year 1946 .......... | | | $759,827.94 | |
| Difference Between Reported Income and Income Charged in Count I ........... | | | 528,824.56 | |
| | | | $231,003.38 | |

(a) Computed by Government witness Loyd (T. R. 515). He arrived at this figure "* * * * by taking the amount of $476,662.16 as testified to by the witness McHale and deducting therefrom the amount of $180,000.00 also testified to by witness McHale as being funds obtained from the Indianapolis Brewing Company used in connection with the acquisition of stock of the Denmark and Eulberg Company and in turn the funds being given to the stockholders in payment of the—of part of the cost of the stock in the brewery, the Indianapolis Brewing Company."

(b) Red figures.

Several points of divergence between defense and prosecution are readily apparent from that analysis. The pith of certain evidentiary aspects is thus laid bare and, without weighing the evidence, I think a charge following the Holland standard is required.

I am well aware that the Holland court affirmed notwithstanding some challenges, launched by the Hollands against the district judge's charge, yet I think the pattern of instructions laid down by the Supreme Court is controlling in Bardin's appeal.

It clearly appears that the 42 instructions given below were inadequate, incomplete and incompatible with these views authored by the Holland, 348 U.S. 121, 129, 75 S.Ct. 127, 132, majority:

"While we cannot say that these pitfalls inherent in the net worth method foreclose its use, they do require the exercise of great care and restraint. The complexity of the problem is such that it cannot be met merely by the application of general rules. \* \* \* (Citing.) Trial courts should approach these cases in the full realization that the taxpayer may be ensnared in a system which, though difficult for the prosecution to utilize, is equally hard for the defendant to refute. *Charges should be especially clear, including, in addition to the formal instructions, a summary of the nature of the net worth method, the assumptions on which it rests, and the inferences available both for and against the accused.* \* \* \* " (Italics supplied.)

To by-pass this quoted portion from the Holland case, handed down subsequent to Bardin's trial, predicated either upon sequence in adjudications, or failure to assert certain errors of which I now take cognizance would be inharmonious with fair play and sound administration of criminal justice. Respect for law is too easily lost among technical brambles. Though the instructions, given below, are unchallenged at this level, their inadequacy is indisputable by contrast

with the Holland criteria. My course is simply consistent with Rule 52(b), Fed. R.Crim.P. 18 U.S.C.A. and should not be hereafter construed as opening the sluices for examination of other than plain errors adversely affecting substantial rights of defendants. I would delimit such holding to the situation now before us. As I analyze the assorted instructions it is clear there were none summarizing the nature of the net worth theory, and no explanations of its assumptions were explained to the jury. The expenditure aspect of this case was also neglected. Certainly detachment and objectivity, both in feeling and thought, are difficult enough outside a courtroom without expecting an untutored jury to reach sound, fair and just conclusions in a complex case such as this unless they are supplied the correct legal benchmarks. It is difficult to see how these jurors could correctly determine if the evidence adduced, during trial, fitted within the framework of the offense described in the indictment.

Because the Holland court affirmed despite its own delineation of criteria for measuring jury changes in net-worth cases, fails, in my opinion, to furnish an escapehatch for use in the instant appeal. I am unable to perceive why justice must be postponed "for future trials based on the net-worth theory." Awaiting decisions in Holland and its companion cases was, apparently, only an empty gesture on our part. I say this even after reading the Holland's petition for rehearing, denied 348 U.S. 932, 75 S.Ct. 334, grounded upon alleged defective instructions evaluated by the Supreme Court's own announcements in their case. It is idle to speculate why the petition was rejected. Yet the criteria was laid down in the Holland opinion and this defendant ought to have the benefit of our foresight in waiting as we did. I think we should have some hesitancy in flaunting such specific standards for jury instructions however the bellwether case was ultimately determined. My view, here, buttressed by the statement made in Holland v. United States, 1954, 348

U.S. 121, 127, 75 S.Ct. 127, 131, which precedes the court's six point approach: "This leads us to point out the dangers that *must* be consciously kept in mind in order to assure *adequate* appraisal of the specific facts *in individual cases*." (Italics supplied.)

Nevertheless, Mr. Justice Clark said in his prefatory portion of the Holland opinion, 348 U.S. 121, 125, 75 S.Ct. 127, 130, "careful study indicates that it (the net-worth method) is so frought with danger for the innocent that the courts must closely scrutinize its use. One basic assumption in establishing guilt by this method is that most assets derive from a taxable source, and that when this is not true the taxpayer is in a position to explain the discrepancy. The application of such an assumption raises serious legal problems in the administration of the criminal law."

Relevant, here, is one of the dangers from among the six mentioned by the Holland opinion:

(A) "* * * the method requires assumptions, among which is the equation of unexplained increases in net worth with unreported taxable income. Obviously such an assumption has many weaknesses. It may be that gifts, inheritances, loans and the like account for the newly acquired wealth. There is great danger that the jury may *assume* that once the Government has established the figures in its net worth computations, the crime of tax evasion *automatically follows*." (Italics added.)

When certain conduct of the United States Attorney is heaped upon these defective instructions I would be driven to ignore the realities of life to assume absence of any impact upon the jurors' minds. In its brief, the government argues that its counsel "* * * made a single, isolated reference to Alvin Bardin's refusal to testify which he (counsel) immediately mitigated by telling the jury to disregard what he said and draw no inferences from it." Falling back on

defendant's failure to object or request an instruction, the prosecution would have us ignore this episode. Though its argument suggests some super-technical credit it reveals a robust disregard of human nature in the jury box. Moreover, defendant's case was interlaced with alleged financial relationships between the brothers Bardin. Consequently the government attorney's generous remarks only served to underscore the prosecution's point and cut ground from under the man on trial.

For this latter reason and, because I am opposed to "guessing" defendants into prison, especially when the Supreme Court has specifically instructed both appellate and trial courts in the handling of net-worth cases, I would reverse this judgment of conviction and order a new trial.